Randolph WALKER, Daniel S. Bridge
and Melvin Drain, et al.,
Plaintiffs-Appellees,

v.

Charles HUGHES, former warden, and Herb Beal, Individually and in his capacity as Warden of the Federal Correctional Institution at Milan, Michigan, Defendants-Appellants.

No. 76–1974.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 20, 1976.

Decided June 24, 1977.

Rehearing Denied Aug. 12, 1977.

Philip Van Dam, U. S. Atty., Gwenn L. Carr, Michele C. Mayes, Detroit, Mich., Glenda G. Gordon, Chief, Sp. Litigation Section, Crim. Div., Dept. of Justice, S. Cass Weiland and George W. Calhoun, Washington, D. C., for defendants-appellants.

Gail S. Benson, John W. Tapp, F. Randall Karfonta and William L. Woodard, Detroit, Mich., for plaintiffs-appellees.

Before EDWARDS, PECK and LIVELY, Circuit Judges.

JOHN W. PECK, Circuit Judge.

█ Defendant Warden of the Federal Correctional Institution at Milan, Michigan (FCI–Milan), perfected this appeal from a judgment rendered for a plaintiff class of inmates.[1] The plaintiff class challenges the constitutional adequacy of procedures afforded prisoners in disciplinary hearings at FCI–Milan. The plaintiff class is certified to consist of all inmates at FCI–Milan who have been subject to "Adjustment Committee" procedures existing as of July 10, 1973.[2] Because the Bureau of Prisons and the FCI–Milan Policy Statements, which instituted the Adjustment Committee procedures existing as of July 10, 1973, were both in effect from July 7, 1972, to October 4, 1974, the plaintiff class in effect consists of those inmates who faced disciplinary charges between July 7, 1972, and October 4, 1974.

FCI–Milan is a medium security institution for young offenders and offers a wide range of rehabilitation programs for the

1. This lawsuit is a product of the consolidation of three separately filed cases. One case, *Randolph Walker and Rogers, on behalf of themselves and others similarly situated v. Charles Hughes,* No. 39765, was brought as a civil rights class action seeking injunctive and declaratory relief for violation of constitutional rights. A second case, *Daniel S. Bridge, on behalf of himself and others similarly situated v. Charles Hughes,* No. 39834, was brought as a habeas corpus class action seeking injunctive and declaratory relief for violation of constitutional rights. The third case, *Melvin Drain v. Charles Hughes,* No. 40066, was brought as a habeas corpus petition seeking a release from segregation and a bar to transfer to another prison. The consolidation of these lawsuits as a civil class action in effect amended the *Bridge* and *Drain* actions.

At the time the consolidated suit was initially before the district court, Charles Hughes was the Warden of FCI–Milan. The suit was against Hughes individually and as Warden. The Government raised no sovereign immunity objection and so we must presume that the Government consented to the suit to the extent

that the lawsuit proceeded against Hughes as Warden. While it is true that a lawsuit may be maintained against an officer if the officer's actions are within his statutory powers but the powers are constitutionally void, such a lawsuit is properly brought against the officer as an individual. *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Larson v. Domestic Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).

At some point during the district court proceedings, Herbert Beal replaced Charles Hughes as Warden and was substituted as the party defendant by the stipulation of the parties.

2. Even if all the named class representatives had been released from prison, as the Government briefs seem to suggest, the case is not moot because a class was certified. *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Board of School Commissioners of the City of Indianapolis v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975).

inmates. The district court found that four prisoners at the institution were charged with various disciplinary infractions, appeared at Adjustment Committee hearings, and were transferred to other prisons as a consequence of the findings from those hearings. The district court determined that the Adjustment Committee hearings did not provide a number of procedural rights for the plaintiff class of inmates that it held to be necessary to meet Fifth Amendment due process requirements. *Walker v. Hughes,* 386 F.Supp. 32 (E.D. Mich.1974).[3] The procedures held to be required included the right to written notice of the charges, the right to remain silent, the right to call witnesses and produce evidence, the right to confront the accusing officer, the right to cross-examine adverse witnesses, the right to a written decision based only upon the evidence produced at the hearing, and the right to counsel or counsel substitute in certain situations. The district court ordered that these procedural rights be given to inmates before they suffered "grievous loss" by being placed in more restrictive living status (including but not limited to segregation), transferred to maximum security penitentiaries for adult offenders, subjected to significant and adverse effects on parole dates, or deprived of privileges (such as participation in rehabilitation programs). We must reverse because the district court did not use the analysis that the Supreme Court requires for determining how the Due Process Clause of the Fifth or Fourteenth Amendment is involved in this case.

## I

The Fifth Amendment prohibits the United States from depriving a person of life, liberty, or property without due process of law. The first question asked in a due process analysis is whether a life, liberty, or property interest within the meaning of the Due Process Clause is implicated in the case. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). If

such an interest is present, then the second question for resolution is what process must be granted before the person can be deprived of the protected interest. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Thus, the initial inquiry here must be whether the plaintiff class of inmates possessed any Fifth Amendment liberty interests.

The Supreme Court has now made it clear in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), that an individual's grievous loss as a result of state action is not itself enough to trigger the application of the Due Process Clause.

"We reject . . . the notion that any grievous loss visited upon a person by the State is sufficient to invoke the procedural protections of the Due Process Clause. In *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), a university professor was deprived of his job, a loss which was surely a matter of great substance, but because the professor had no property interest in his position, due process procedures were not requires in connection with his dismissal. We there held that *the determining factor is the nature of the interest involved rather than its weight.*" (Emphasis supplied.)

In its preoccupation with the "grievous loss" criterion, the district court failed to analyze properly the nature of the interest of the plaintiff class of inmates. In other words, its concern was with "the nature of [plaintiffs' loss] rather than with its weight." *Roth, supra.* The district judge relied on *Morrissey v. Brewer, supra,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484, for the proposition that "grievous loss" as a result of state action is the prerequisite for the application of the Due Process Clause. Indeed, *Morrissey, supra,* 408 U.S. at 481, 92

---

**3.** This opinion was filed following remand from this Court directing reconsideration in the light of *Wolff v. McDonnell, supra,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935. The District Court's first opinion is reported at 375 F.Supp. 708 (E.D.Mich.1974).

S.Ct. 2593, seemed to make the determination of the question as to whether the nature of the interest demanded the protection of the Due Process Clause depend upon a finding of grievous loss[4] and several Courts of Appeal did interpret *Morrissey* in that way. *Cardaropoli v. Norton,* 523 F.2d 990 (2d Cir. 1975); *Bradford v. Weinstein,* 519 F.2d 728 (4th Cir. 1975); *Holmes v. Bd. of Parole,* 541 F.2d 1243 (7th Cir. 1976). However, under *Meachum,* the emphasis is on whether there is entitlement to be "free from bodily restraint," *Morrissey v. Brewer, supra,* 408 U.S. at 484, 92 S.Ct. 2593, or "to enjoy those privileges recognized as essential to the orderly pursuit of happiness." *Board of Regents v. Roth, supra,* 408 U.S. at 572, 92 S.Ct. at 2706; *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). In effect, *Meachum* equated the threshold test for the finding of a liberty interest with that for determining whether a property interest exists. *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709, laid down this criterion in examining the nature of an alleged property interest:

> "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. *He must . . . have a legitimate claim of entitlement to it."* (Emphasis supplied.)

Contrary to assertions made on appeal by the plaintiff class, *Meachum* clarified due process analysis of liberty interests. The Supreme Court had observed before *Meachum* in *Wolff v. McDonnell, supra,* 418 U.S. at 557, 94 S.Ct. at 2975, that due process "analysis as to liberty parallels the accepted due process analysis as to property." The Supreme Court therein focused on the nature of the prisoners' right to good time credits rather than on the potential loss from the deprivation of such credits. In *Morrissey* the Court found the necessary liberty entitlement in "at least the implicit promise that parole will be revoked only if he fails to live up to the parole conditions." *Morrissey v. Brewer, supra,* 480 U.S. at 480–81, 92 S.Ct. at 2601.

For at least two reasons the requirement of an entitlement for the existence of a due process liberty interest, instead of a finding of grievous loss, is the prescribed approach. First, a standard of grievous loss would measure the weight of the individual interest rather than determining its nature, contrary to the intention of *Roth, supra,* 408 U.S. at 570–71, 92 S.Ct. 2701, and *Morrissey, supra,* 408 U.S. at 481, 92 S.Ct. 2593. Second, the requirement of an entitlement provides an appropriate basis for compromise between the need for the protection of individual interests and the need for government action unhampered by procedural burdens. A standard of grievous loss would interfere more directly with government responsibilities. The Supreme Court in *Meachum v. Fano, supra,* 427 U.S. at 225, 96 S.Ct. at 2538, recognized that fact in the context of prison management.

> "[T]o hold as we are urged to do that any substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts."

---

**4.** The relevant passage in *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), appeared as follows.

> We turn, therefore, to the question whether the requirements of due process in general apply to parole revocations. As Mr. Justice Blackmun has written recently, "this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" *Graham v. Richardson,* 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534, 543 (1971). Whether any procedural protections are due depends on the extent to which an individual will be "condemned to suffer grievous loss." *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817, 852 (1951) (Frankfurter, J., concurring), quoted in *Goldberg v. Kelly,* 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287, 296 (1970). The question is not merely the "weight" of the individual's interest, but whether the nature of the interest is one within the contemplation of the "liberty or property" language of the Fourteenth Amendment.

Thus for the Due Process Clause to apply in the present case the plaintiff class of inmates must have had some kind of liberty entitlement not to be placed in a more restrictive living status, not to be transferred to maximum security penitentiaries for adult offenders, not to be subjected to significant and adverse effects on parole dates, and not to be deprived of privileges. The question is whether the Due Process Clause applied to the interests of the plaintiff class at FCI–Milan.

The Supreme Court in *Meachum v. Fano, supra,* 427 U.S. at 224, 96 S.Ct. at 2538, rejected the idea that:

". . . any change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause. The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause. But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and to subject him to the rules of its prison systems so long as the conditions of confinement do not otherwise violate the Constitution."

It thus appears that prison rules may confine prisoners in more restrictive living status because the Constitution by its own force does not require that prisoners be kept in the general prison population, allow for the transfer of inmates to another prison because the Constitution by its own force does not require that a person be confined in any particular prison,[5] subject inmates to significant and adverse effects on parole because the Constitution by its own force does not require parole, or deprive inmates of privileges because the Constitution by its own force does not require that prisoners be given such privileges as participation in rehabilitation programs. The Constitution by its own force permits sanctions to be placed on a prisoner as a result of a disciplinary hearing even though they may virtually end a prisoner's rehabilitation program. The Supreme Court was unpersuaded by the dissenting opinion of Justice Stevens in *Meachum v. Fano, supra,* 427 U.S. at 234, 96 S.Ct. at 2540–2543, in which he contended that a prisoner "has a protected right to pursue his limited rehabilitation goals" that the Due Process Clause would recognize by its own force.

If the plaintiff class of inmates had any liberty interests protected by the Due Process Clause, they were created by federal law. The Supreme Court has not directly addressed the question of whether federal law has created the liberty interests that the plaintiff class contends it has, but it has addressed the question of whether state laws have. In *Wolff v. McDonnell, supra,* 418 U.S. at 557, 94 S.Ct. 2963, the Supreme Court held that Nebraska law had created a liberty interest for prisoners in good time credits. The Court also concluded in *Wolff, supra,* 418 U.S. at 571 n. 19, 94 S.Ct. 2963, that Nebraska law had created a liberty interest in being not placed in segregation except for major misconduct. On the other hand, in *Meachum v. Fano, supra,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), the Supreme Court held that Massachusetts and New York law did not create a liberty interest precluding transfer to another prison.

Federal statutory law gives federal prison officials full discretion in the treatment of prisoners and does not restrict the authority of prison officials over the inmates

---

**5.** The Supreme Court in *Meachum, supra,* 427 U.S. at 225, 96 S.Ct. at 2538, stated that:
. . . the Due Process Clause [does not] in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose. That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.

as to placement in more restrictive living status, transfer to other prisons, subjection to significant and adverse effects on parole dates, and deprivation of privileges. Under 18 U.S.C. § 4042,[6] the Bureau of Prisons is invested with the responsibility of management and regulation of the federal prison system. Under 18 U.S.C. § 4082(b),[7] the Attorney General has the authority to transfer a prisoner from one penal institution to another at any time.

There is no question but that Congress can create property or liberty interests protected by the Due Process Clause, *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), and Congress has granted discretionary authority to prison officials. There is no Congressional provision for interpretive regulations that might restrict the discretionary authority of prison officials and create due process interests for the inmates in accordance with the legislative intent.

Case law requires the conclusion that, standing alone, the relevant federal statutory provisions, because they grant discretionary authority to prison officials, do not themselves create any liberty interests. In *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), the Supreme Court held that a federal parolee imprisoned for a crime committed while on parole was not constitutionally entitled to a prompt parole revocation hearing when a parole violator warrant was issued and lodged at his place of former confinement but not served on him. The Court said that nothing in the statute or regulations restricted the discretion of the Parole Commission which gave the parole violator the right to force a prompt decision, and that without such an entitlement due process requirements did not apply even though there might be adverse consequences to an inmate. The Court also made this observation:

"In *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, for example, no due process protections were required upon the discretionary transfer of state prisoners to a substantially less agreeable prison, even where that transfer visited a 'grievous loss' upon the inmate. The same is true of prisoner classification and eligibility for rehabilitative programs in the federal system. *Congress has given federal prison officials full discretion to control these conditions of confinement, 18 U.S.C. § 4081, and petitioner has no legitimate statutory or constitutional entitlement sufficient to invoke due process."* (Emphasis supplied.) 429 U.S. at 88, 97 S.Ct. at 279 n. 9.

As the Supreme Court recognized in *Moody,* in *Meachum v. Fano, supra,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451, the discretion granted to Massachusetts prison officials precluded finding under Massachusetts law a created liberty interest to being

---

**6.** 18 U.S.C. § 4042:

The Bureau of Prisons, under the direction of the Attorney General, shall—

(1) have charge of the management and regulation of all Federal penal and correctional institutions;

(2) provide suitable quarters and provide the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;

(4) provide technical assistance to State and local government in the improvement of their correctional systems.

This section shall not apply to military or naval penal or correctional institutions or the persons confined therein.

**7.** 18 U.S.C. § 4082(a)(b):

(a) A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served.

(b) The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise, and whether within or without the judicial district in which the person was convicted, and may at any time transfer a person from one place of confinement to another.

not transferred to another prison. The *Meachum* Court reasoned that:

"... Massachusetts prison officials have the discretion to transfer prisoners for any number of reasons. Their discretion is not limited to instances of serious misconduct. As we understand it no legal interest or right of these respondents under Massachusetts law would have been violated by their transfer whether or not their misconduct had been proved in accordance with procedures that might be required by the Due Process Clause in other circumstances. Whatever expectation the prisoner may have in remaining at a particular prison so long as he behaves himself, it is too ephemeral and insubstantial to trigger procedural due process protections as long as prison officials have discretion to transfer him for whatever reason or for no reason at all." 427 U.S. at 228, 96 S.Ct. at 2540.

The trouble in the present case is that the federal statutory provisions granting discretionary authority to prison officials do not stand alone. The Director of the Bureau of Prisons and the Warden of FCI–Milan have both issued policy statements. The Adjustment Committee procedures, of which the plaintiff class complained, were authorized by these policy statements: Bureau of Prisons Policy Statement; Subject: Inmate Discipline, No. 7400.5B, 6–6–72 and Milan Institution Policy Statement; Subject: Inmate Discipline, MM 7400.1, 7–20–72. On appeal to this Court, the plaintiff class contends that these policy statements create liberty interests protected by the Due Process Clause.

■ There are problems with recognizing the creation of liberty interests in policy statements issued by executive officers, in this case prison officials. First, once a liberty interest is established, it is the responsibility of the courts to determine whether sufficient procedural protections have been afforded to an individual from whom the interest has been taken, and such judicial review can cause the courts to intervene in matters left to other branches of government. This Court in *Johnson v. Avery,* 382 F.2d 353, 355 (6th Cir. 1967), recognized in language not disturbed by the Supreme Court's reversal (393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)):

"... the well-established reluctance of the Federal Courts to intervene in internal affairs of state or Federal penal institutions. Regulations for the administration and discipline of prisons, promulgated and enforced by duly authorized officials, are not subject to review by the courts unless it can be clearly demonstrated that they interfere with fundamental rights guaranteed by the Constitution.

This proposition is soundly based on the fact that prison administration is a function of the executive branch of the Government and one for which the courts, with their limited experience and facilities, are ill-suited to undertake."[8]

But executive officials cannot create a liberty interest and then provide procedural protections beyond the review of the courts. Property and liberty guarantees secure the individual against arbitrary government action, *Wolff v. McDonnell, supra,* 418 U.S. at 558, 94 S.Ct. 2963, and constitutional protection of liberty and property requires that the final judgment regarding the procedural safeguards be invested in the judiciary. *Arnett v. Kennedy,* 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15 (Powell, J., concurring), 177, 94 S.Ct. 1633 (White, J., concurring in part and dissenting in part), 206, 94 S.Ct. 1633 (Marshall, J., dissenting); *Murray's Lessee v. Hoboken Land Improvement Co.,* 59 U.S. (18 How.) 272, 15 L.Ed. 372 (1855).

---

8. Other Courts of Appeal have expressed similar views. *Beard v. Lee,* 396 F.2d 749 (5th Cir. 1968); *Long v. Parker,* 390 F.2d 816 (3d Cir. 1968); *United States v. Marchese,* 341 F.2d 782 (9th Cir.) *cert. denied,* 382 U.S. 817, 86 S.Ct. 41, 15 L.Ed.2d 64 (1965); *McCloskey v. State of Maryland,* 337 F.2d 72 (4th Cir. 1964); *Sostre v. McGinnis,* 334 F.2d 906 (2d Cir.), *cert. denied,* 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); *Childs v. Pegelow,* 321 F.2d 487 (4th Cir. 1963), *cert. denied,* 376 U.S. 932, 84 S.Ct. 702, 11 L.Ed.2d 652 (1964).

The second problem with recognizing the executive creation of liberty interests is that the primary function of the executive branch of government is administration and not law-making, and the creation of a constitutionally protected interest is clearly law-making. In the pertinent Supreme Court cases finding the existence of due process interests, their creation was effected by statute or contracting private parties and not by executive officials. Thus *Wolff v. McDonnell, supra,* 418 U.S. at 556–57, 94 S.Ct. 2963, the creation of a conditional liberty interest in good time credits was accomplished by a Nebraska statute. In *Arnett v. Kennedy, supra,* 416 U.S. at 151–52, 164–67, 185, 207–11, 94 S.Ct. 1633, the creation of the property interest in tenured civil service employment was done by a federal statute, 5 U.S.C. § 7501(a). In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the creation of a property interest in public education was accomplished by an Ohio statute. In *Perry v. Sindermann,* 408 U.S. 593, 599–603, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the property interest in a tenured professorship was created by implied contract.

The third problem with recognizing the executive creation of liberty interests is that written executive policies provide an unsatisfactory foundation for establishing the necessary entitlement. In the present case, the policy statements did not appear in the Federal Register. Nor were they interpretive of the statute. Moreover, the policy statements could be revoked by the discretionary act of the Bureau of Prisons. For example, during the progress of this lawsuit, Bureau of Prisons Policy Statement No. 7400.5B was replaced by Bureau of Prisons Policy Statement No. 7400.5C.

This third problem raises an unsettling question. May the Director of the Bureau of Prisons create a liberty interest in a policy statement and then destroy it by revoking the statement? If a prison official can destroy liberty interests pursuant to his discretionary authority, it is doubtful that a Constitutional issue is presented. The granting of rights to prisoners in the area of disciplinary hearings may be wise and to be encouraged, but not every wise policy can be read into the Constitution. On the other hand, if a prison official cannot modify liberty interests which he has previously created, prison officials may be deterred from granting rights to prisoners out of fear that their legislatively granted discretion will be restricted and they may have hampered their own ability to act flexibly to meet future needs and to implement new knowledge as to prison management.

On balance, we conclude that policy statements, such as are before us in the present case, can create liberty interests, *see* Jaffe, Judicial Review of Administrative Action 28–33 (1965), and that we have jurisdiction to review promulgations of prison officials with respect to the appropriate procedural protections to be given inmates in prison disciplinary hearings. In *Perry v. Sindermann, supra,* 408 U.S. at 599–603, 92 S.Ct. 2694, the source of the property interest in a tenured professorship was in policy guidelines promulgated by the university officials and not by the formal contract. The *Perry* Court read into the professor's contract of employment those guidelines and said:

" . . . 'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' [*Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. 2701.] A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." 408 U.S. at 601, 92 S.Ct. at 2699.

Because due process analysis of liberty has paralleled that of property, *Wolff v. McDonnell, supra,* 418 U.S. at 557–58, 94 S.Ct. 2963, liberty interests can be created by rules or mutually explicit understandings. The present case is analogous to *Perry* because the policy statements issued

by the prison officials can be read into the statutory grant of authority to the prison officials.

This analogy is strengthened by this Court's decision in *Wells v. Board of Regents*, 545 F.2d 15 (6th Cir. 1976). As in *Perry, Wells* concerned an alleged property interest to tenured professorships, but the relationship between the university and the teachers in *Wells* was governed by statute and not by contract. In *Wells,* this Court found that governing Kentucky law gave the university Board of Regents complete authority as to tenure policy and that the plaintiff teachers had not obtained any due process property interest in their jobs because the university Board of Regents had exercised their statutory authority by adopting explicit policies under which none of the plaintiffs qualified for tenure. *Wells* recognized the ability of the university officials to adopt policies that could grant property interests protected by the Due Process Clause despite the statutory grant of discretion to the university officials with regard to tenure policies.

In addition, several Supreme Court cases have cited regulations promulgated by executive officers in the discussion of the creation of interests protected by due process. In *Wolff v. McDonnell, supra,* 418 U.S. at 544–48, 94 S.Ct. 2963, Nebraska prison policy statements, similar to the policy statements in the present case, were quoted in the process of finding a state created liberty interest for prisoners to good time credits. In *Arnett v. Kennedy, supra,* 416 U.S. at 139–48, 94 S.Ct. 1633, U.S. Civil Service Commission regulations were cited in the process of finding a created property interest in tenured civil service employment. See *Goss v. Lopez, supra,* 419 U.S. at 573, 95 S.Ct. 729.

■ Even though the policy statements in the present case could have created liberty interests, we conclude that the district court erred in finding the broad liberty interests that it did. Bureau of Prisons Policy Statement No. 7400.5B and Milan Institution Policy Statement MM 7400.1 clearly did not grant liberty interests to the plaintiff class of inmates in not being placed in more restrictive living status, not being transferred to maximum security penitentiaries, not being subjected to significant adverse modification of parole dates, and not being deprived of privileges.

More narrowly drawn liberty interests were granted by the policy statements. Under Milan Institution Policy Statement MM 7400.1, Adjustment Committee procedures were used for instances of inmate "major misconduct." [9] For punishment, sanctions that the Adjustment Committee could impose included segregation, transfer to other prisons, forfeiture of good time credits, and loss of privileges. Thus, the plaintiff class had liberty interests not to have those sanctions imposed on them except upon a finding of major misconduct by the Adjustment Committee. See *Wolff v. McDonnell, supra,* 418 U.S. at 556–57, 94 S.Ct. 2963. We should add that loss of privileges alone would not require the procedures demanded for the deprivation of the conditional liberty interests to be free from segregation, transfer to other prisons, or forfeiture of good time credits. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 1560, 47 L.Ed.2d 810 (1976).

## II

Since it has been determined that liberty interests do exist in the present case, the question to be answered is what process is due the plaintiff class of inmates at FCI–Milan in prison disciplinary hearings? The inquiry "must begin with a determination

---

9. FCI–Milan Policy Statement at 19:

   6. *MISCONDUCT:*

   A. *Major Misconduct:*

     Major misconduct is a serious violation and will be reported formally to the Adjustment Committee on the misconduct report form. A detailed narrative may be attached.

   B. *Minor Misconduct:*

     Minor misconducts are less serious violations which may be resolved immediately and informally by the Inmate's supervisor or formally reported on the misconduct report form.

of the precise nature of the government function involved as well as of the private interest that has been affected by government action." *Morrissey v. Brewer, supra,* 408 U.S. at 481, 92 S.Ct. at 2600; *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

■ Prisoners have an interest in fair prison disciplinary hearings. Due process protection of liberty interests held by prisoners safeguard them from arbitrary government action. *Wolff v. McDonnell, supra,* 418 U.S. at 558, 94 S.Ct. 2963. However, prisoners are subject to restrictions imposed by the nature of the penal institution. *Wolff v. McDonnell, supra,* 418 U.S. at 556, 94 S.Ct. 2963. Prisoners who have been lawfully committed to a penal institution are not entitled within that institution to the full panoply of rights in disciplinary hearings which would be due in criminal prosecutions. *Wolff v. McDonnell, supra,* 418 U.S. at 556, 94 S.Ct. 2963.

Prison disciplinary hearings necessarily involve different considerations than those associated with prosecutions of the accused or with parole revocations. *Wolff v. McDonnell, supra,* 418 U.S. at 560, 94 S.Ct. 2963. The Supreme Court has described the background in which disciplinary hearings must be structured.

"Prison disciplinary proceedings. . . take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. Although there are very many varieties of prisons with different degrees of security, we must realize that in many of them the inmates are closely supervised and their activities controlled around the clock. Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner."

*Wolff v. McDonnell, supra,* 418 U.S. 561–62, 94 S.Ct. 2977. It is against this background that the Supreme Court has said that a judgment on the constitutional issue must be made, requiring an accommodation between the special needs of the prison institution and the provisions of the Constitution that are of general application. *Wolff v. McDonnell, supra,* 418 U.S. at 560, 562, 94 S.Ct. 2963.

*Wolff v. McDonnell, supra,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935, and *Baxter v. Palmigiano, supra,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810, are two prisoners' rights cases in which the Supreme Court has considered the extent of protection that the Due Process Clause provides in disciplinary hearings. Although both cases involved state prisons and the Due Process Clause of the Fourteenth Amendment, the determinations reflect the judgment of the Supreme Court as to the respective weights to be given the interests of the prison and the inmate in the context of disciplinary hearings and apply equally well to federal prisons and the Due Process Clause of the Fifth Amendment.

■ We conclude that the district court did not properly perceive the relationship of *Wolff* to the present case. The procedural rights determined to be necessary under the Fifth Amendment by the district court were broader than *Morrissey v. Brewer, supra,* 408 U.S. 489, 92 S.Ct. 2593, required for parole revocations. The Supreme Court in *Wolff,* however, contrasted the interests in parole revocations with those in prison disciplinary hearings and concluded that the nature and needs of the prison were such that not all the procedural protections demanded in parole revocation hearings under *Morrissey* were constitutionally required in prison disciplinary hearings. *Wolff v. McDonnell, supra,* 418 U.S. at 558–72, 94

S.Ct. 2963. We feel that the district court simply went too far.

The order under review cannot be justified on the basis that it was setting standards for a medium security institution designated for youthful offenders rather than, as in *Wolff,* for all prisons, including maximum security institutions. In *Wolff, supra,* 418 U.S. at 562, 94 S.Ct. 2963, the Supreme Court decided that all prisons will be treated as one category so that minimum due process requirements will be the same for all penal institutions. Even if it had been proper in the present case to narrow the inquiry to medium security institutions, the number of procedural rights to be granted to inmates in disciplinary hearings still should not have equalled or exceeded those granted to parolees in parole revocation hearings.

▆▆▆▆▆▆ Applying to the present case the Supreme Court's guidance in *Wolff* and *Baxter,* we conclude that there was no due process violation. The procedures formally provided by the prison authorities at FCI–Milan were constitutionally adequate, and there was no finding of fact that the procedures were not properly implemented. The district court ordered eleven procedural rights to be provided inmates in the plaintiff class, but of those listed, the rights we find to be required by due process were already available.

The district court ordered that written notice of the charges be provided an inmate. That is required by due process, *Wolff v. McDonnell, supra,* 418 U.S. 563–64, 94 S.Ct. 2963, and the policy statements issued by the Bureau of Prisons and the Milan Institution clearly incorporated this procedure.[10]

The district court ordered that written notice of procedural rights be given an inmate. The plaintiff class of inmates concedes that this issue was not raised in *Wolff* or in *Baxter,* and we decline to find a violation of due process for failure to provide such notice. *Wolff, supra,* 418 U.S. at 862–72, 94 S.Ct. 2963, and *Baxter, supra,* 425 U.S. at 314–322, 96 S.Ct. at 1556–60, fell short of requiring those procedures which would give disciplinary proceedings a more adversary cast.

The district court ordered that there be instituted a neutral, detached, and continuously identical panel of fact finders, from which investigators, case workers, and confidants have to be excluded. In *Wolff, supra,* 418 U.S. at 570–71, 94 S.Ct. 2963, however, due process required only an Adjustment Committee that did not present a hazard of arbitrary decision making. The *Wolff* Court rejected argument that the Adjustment Committee under Nebraska law was not sufficiently impartial. Similarly, we find that the Adjustment Committee at FCI–Milan did not present a hazard of arbitrary decision making to the plaintiff class. The Adjustment Committee at FCI–Milan was composed of the Chief or Associate Warden, the Chief of Classification & Parole or a designated case worker, and the Chief Psychologist. Neither the reporting nor the investigating officer could be a member of the Adjustment Committee. The Adjustment Committee was to meet three times a week, to evaluate misconduct reports as to underlying causes for the adverse behavior, to consider the inmate's individual history and institutional adjustment in taking disciplinary action, to maintain accurate records, to concern itself with the institution's policies with respect to dis-

---

**10.** Bureau of Prisons Policy Statement at 7:

(c) *Procedural Requirements*: The Adjustment Committee and/or Treatment Team handling inmate discipline will adopt the following practices:

(1) All inmates charged with misconduct or violation of a rule or regulation of the institution will be informed of the specific charges and will be given an opportunity to answer.

FCI–Milan Policy Statement at 7:

The inmate will be given a a copy of the incident report. Ordinarily, this will be done by the investigator at the beginning of the investigation. This will be recorded in the space provided on the original misconduct report form. If the investigation is delayed for any reason, any designated employee will deliver the charges to the inmate. This will be done within eight (8) hours of the time of the incident, unless there are exceptional circumstances which prevent it.

cipline, and to maintain consistency in its actions. These practices were designed to implement the overall policy of controlling inmate behavior in a completely impersonal, impartial, and consistent manner.[11]

The district court ordered that an inmate facing disciplinary charges be given the opportunity to remain silent and that the exercise of this right not itself cause a change of status for the inmate. The policy statements issued by the Bureau of Prisons and FCI–Milan did not deny to an inmate the opportunity to remain silent. The FCI–Milan Policy Statement simply states that the Adjustment Committee will ask the inmate to comment on the charges. The inmate could remain silent by refusing to take advantage of the opportunity to make a statement in his own behalf. The Adjustment Committee could not live up to its responsibilities in considering the inmate's history and institutional adjustment and in evaluating misconduct reports for underlying causes of adverse behavior while at the same time penalizing the inmate solely for the exercise of the right to remain silent. While adverse inferences from an inmate's silence were not prevented by the policy statements, the Supreme Court in *Baxter, supra,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810, held that such adverse inferences in the context of prison disciplinary hearings were constitutionally permissible.

The order appealed from required that an inmate be given the opportunity to confront the officer writing up the incident report and to cross-examine adverse witnesses, a right which may be abridged by prison officials only by written reasons. The plaintiff class on appeal has rightly conceded that the portion of the order with respect to both of these procedures cannot stand because it is inconsistent with the Supreme Court's holdings in *Baxter, supra,* 425 U.S. at 322, 96 S.Ct. at 1560.

The district court ordered that the Adjustment Committee provide an inmate with an opportunity to make a statement in his own behalf. The policy statements issued by the Bureau of Prisons and Milan Institution incorporated this procedure.

The subject order provided that an inmate be given an opportunity to call witnesses and present evidence in his defense unless the record clearly indicates that to do so would present a grave threat to institutional security. This portion of the court order goes too far. In *Wolff, supra,* 418 U.S. at 566–67, 94 S.Ct. 2963, the Supreme Court only decided that an inmate had a right "to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. In *Baxter, supra,* 425 U.S. at 322, 96 S.Ct. at 1560, the Supreme Court decided written reasons were not required for denial of the conditional right to call witnesses and present evidence. The trial court did not indicate how the policy statements issued by the Bureau of Prisons and the Milan Institution violated this right. The district court did make a fact finding that two of the three class representatives were denied the opportunity to call witnesses, but that denial is permissible when calling witnesses would be unduly hazardous to institutional safety or correctional goals, and the absence of such a hazard was not found.

The subject order required that the Adjustment Committee shall provide an inmate counsel or counsel substitute if the case is complex, the inmate is illiterate, or the right to call witnesses is denied. However, the Supreme Court in *Wolff, supra,* 418 U.S. at 569–70, 94 S.Ct. 2963, only said that when an inmate is illiterate or the issues are complex, the inmate should be free to seek assistance from a fellow inmate or from the prison staff. *Wolff* made no mention of an entitlement to seek assistance when the right to call witnesses has been denied. Moreover, the Supreme Court in *Baxter, supra,* 425 U.S. at 314, 96 S.Ct. at 1556, held that an inmate does not have a right to counsel appointed by the State.

---

**11.** FCI–Milan Policy Statement, pp. 1–9.

The error on this point stems from the fact that the plainly expressed concern of the Supreme Court in *Wolff*, repeated in *Baxter*, that a right to counsel would make prison disciplinary proceedings too adversary was not taken into account. The policy statements issued by the Bureau of Prisons and the Milan Institution did not deny to inmates the freedom to seek assistance in preparing to meet charges before the Adjustment Committee when the issues were complex or the inmate was illiterate. Rather, the Adjustment Committee was invested with the responsibility of making certain that the inmate understood the nature of the charges and the details of the incident.

The district court ordered the Adjustment Committee to provide a written decision based only upon the evidence presented at the hearing and that mere written accusation and rumor not be used as adequate evidence of a violation of prison rules by an inmate. All the Supreme Court required in *Wolff, supra,* 418 U.S. at 564, 94 S.Ct. at 2979, however, was a "written statement by the fact finders as to the evidence relied on and reasons." *Wolff* did not forbid the use of facts not presented at the formal hearing,[12] and *Baxter, supra,* 425 U.S. at 322, 96 S.Ct. at 1560 n. 5, stated that such facts could be used. *Wolff* did not pronounce any standards as to adequate evidence. Thus nothing more than a written statement by the Adjustment Committee as to the evidence relied on and reasons therefor could be required by order. Similarly, the finding that the Adjustment Committee was not required to make the written statement demanded by *Wolff* cannot stand. The policy statements clearly provided that the Adjustment Committee shall make a written report stating the details of the occurrence of the offense and the conclusions of the Committee about the involvement of the inmate in the offense, along with the information upon which the conclusions are based.

Finally, the district court ordered the Adjustment Committee to provide a hearing as soon as possible following an alleged incident. The Bureau of Prisons Policy Statement required this procedure.

### III

The district court concluded with a determination that its holdings should be applied retroactively. We do not reach the issue of whether *Wolff, supra,* 418 U.S. at 573–74, 94 S.Ct. 2963, which refused to make its holdings retroactive, could be distinguished. The procedures afforded the plaintiff class of inmates did not violate due process. Even if the procedures violated due process, a finding of retroactivity would be inappropriate. The judgment in the present case only applies to the plaintiff class of inmates and not to any inmate at FCI–Milan who faced disciplinary charges before the institution of Adjustment Committee procedures at the time both Bureau of Prisons and FCI–Milan Policy Statements were in effect, beginning July 7, 1972. Inmates at FCI–Milan who faced disciplinary charges before July 7, 1972, may or may not have had the liberty interests which were granted to inmates at FCI–Milan by July 7, 1972. Without the determination of the existence of such liberty interests, no due process review of procedural protections existing before July 7, 1972, is possible.

It is not necessary to remand the case to the district court, as has been requested by the plaintiff class of inmates. The relevant policy statements are part of the record. The issue as to whether the policy statements have created liberty interests is a question of law. Any informal understandings that might have supplemented these policy statements would constitute a basis too tenuous on which to find constitutionally protected entitlements. Reference is also made to the fact that this case was briefed and argued in the context of presenting four separate issues concerning placement in more restrictive living conditions, transfers to other institutions,

---

12. Justice Douglas dissented in *Wolff* on, among other things, this point. *Wolff v. McDonnell, supra,* 418 U.S. 539, 593, 94 S.Ct. 2963, 41 L.Ed.2d 935 (Douglas, J., dissenting). The *Wolff* Court was aware of the issue and did not accept the position of Justice Douglas.

significant and adverse effects on parole dates, and deprivation of rehabilitation programs, respectively. However, in the light of the foregoing discussion no basis for distinguishing among them or for providing different procedural due process safeguards is seen to exist, except that some modification of remedy might be appropriate in the fourth category of cases.

The judgment of the district court is reversed, and the cause is remanded to the district court with instructions to dismiss the complaint.

EDWARDS, Circuit Judge, dissenting.

Respectfully I dissent. This is a class action brought by certain federal prisoners at the Federal Correctional Institution at Milan, Michigan, alleging that they had been denied due process in various aspects of the prison's disciplinary procedures. Much water has flowed under many bridges since the action was originally filed. Initially, after the District Court granted relief by Opinion and Order dated January 24, 1974, this court remanded the case for reconsideration in the light of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), which had been decided in the meantime on June 26, 1974. On remand the District Judge again entered judgment for plaintiffs. *See Walker v. Hughes*, 386 F.Supp. 32 (E.D.Mich.1974).

Subsequent thereto the Supreme Court decided at least three cases which served to restrict *Wolff* and its predecessor, *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). *See Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

Over and above the Supreme Court's activity, we are informed that the Federal Bureau of Prisons has inaugurated a completely new system for grievance handling which is now in effect at Milan. This being so, little if anything remains of the original disputes except those instances where the District Court found that segregation orders for serious misconduct had been entered without minimal due process procedures.

I agree with the majority that the cases cited above require vacation of the District Judge's order. Contrary to the majority opinion, however, I would affirm the District Judge's holding that, absent emergency circumstances, a minimal due process hearing (restated to accord with both *Wolff* and *Palmigiano*) must be provided when a prisoner is placed in segregation. *See Wolff v. McDonnell, supra,* 418 U.S. at 571–72 n. 19, 94 S.Ct. 2963. As to the remainder of the District Judge's order, I would simply remand for reconsideration in the light of the *Meachum, Montanye,* and *Palmigiano* cases.

The District Judge should be able to recognize the impact of these cases. In this record we face no time requirement. Nor is there need to deal with any special circumstances in application of the Supreme Court rulings. Nor is there any demonstrated District Court reluctance to apply the Supreme Court holdings. As a matter of comity between this court and the District Court, I feel we should, under such circumstances, give the District Court the opportunity to adjust to the newly declared Supreme Court case law.

Additionally, I find difficulty in joining the majority's lengthy paraphrase of the Supreme Court's rationale in *Meachum, Montanye,* and *Palmigiano.* It is, of course, the language of those cases and not our paraphrase which controls. If we assume a need for some discussion, I believe there should be specific recognition that our American form of government is based upon the concept that all citizens are "endowed by their Creator" with "unalienable rights" to "liberty," that the United States Constitution was drafted in large measure to "secure" (not to create) those rights, and that even where a citizen has lawfully been deprived of liberty as a result of criminal conviction and sentence, the Constitution follows him within penitentiary walls. *See Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); *Johnson v. Avery,*

393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Wolff v. McDonnell, supra; Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). *See also Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

In *Wolff*, the Supreme Court took pains to make the point that "liberty interests" in penal confinement are not rationed solely at the whim of prison officials:

There is no iron curtain drawn between the Constitution and the prisons of this country. Prisoners have been held to enjoy substantial religious freedom under the First and Fourteenth Amendments. *Cruz v. Beto*, 405 U.S. 319 [92 S.Ct. 1079, 31 L.Ed.2d 263] (1972); *Cooper v. Pate*, 378 U.S. 546 [84 S.Ct. 1733, 12 L.Ed.2d 1030] (1964). They retain right of access to the courts. *Younger v. Gilmore*, 404 U.S. 15 [92 S.Ct. 250, 30 L.Ed.2d 142] (1971), aff'g *Gilmore v. Lynch*, 319 F.Supp. 105 (NDCal.1970); *Johnson v. Avery*, 393 U.S. 483 [89 S.Ct. 747, 21 L.Ed.2d 718] (1969); *Ex parte Hull*, 312 U.S. 546 [61 S.Ct. 640, 85 L.Ed. 1034] (1941). Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race. *Lee v. Washington*, 390 U.S. 333 [88 S.Ct. 994, 19 L.Ed.2d 1212] (1968). Prisoners may also claim the protections of the Due Process Clause. They may not be deprived of life, liberty, or property without due process of law. *Haines v. Kerner*, 404 U.S. 519 [92 S.Ct. 594, 30 L.Ed.2d 652] (1972); *Wilwording v. Swenson*, 404 U.S. 249 [92 S.Ct. 407, 30 L.Ed.2d 418] (1971); *Screws v. United States*, 325 U.S. 91 [65 S.Ct. 1031, 89 L.Ed. 1495] (1945).

Of course, as we have indicated, the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. Cf. *CSC v. Letter Carriers*, 413 U.S. 548 [93 S.Ct. 2880, 37 L.Ed.2d 796] (1973); *Broadrick v. Oklahoma*, 413 U.S. 601 [93 S.Ct. 2908, 37 L.Ed.2d 830] (1973); *Parker v. Levy*, 417 U.S. 733 [94

S.Ct. 2547, 41 L.Ed.2d 439] (1974). Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. Cf. *Morrissey v. Brewer*, 408 U.S., at 488 [92 S.Ct. 2593]. In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.

*Wolff v. McDonnell, supra*, 418 U.S. at 555–56, 94 S.Ct. at 2974. *See also Meachum v. Fano, supra*, 427 U.S. at 224, 96 S.Ct. 2532.