Lonnie ARSBERRY et al.,
Plaintiffs-Appellants,

v.

Allyn R. SIELAFF et al.,
Defendants-Appellees.

Harold LONGSTREET et al.,
Plaintiffs-Appellants,

v.

Allyn R. SIELAFF et al.,
Defendants-Appellees.

No. 77–1237.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 13, 1978.

Decided Nov. 1, 1978.

Barry Sullivan, Chicago, Ill., for plaintiffs-appellants.

Joan B. Safford, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before CUMMINGS and PELL, Circuit Judges, and EAST,* Senior District Judge.

EAST, Senior District Judge.

This 42 U.S.C. § 1983 civil rights case involves 18 named plaintiffs at four Illinois state prisons who were allegedly removed from the general population and placed in segregation or its equivalent for periods ranging from two to eight months without procedural due process. The defendants are various officers and employees of the Illinois Department of Corrections (Department).

The two actions of *Arsberry, et al. v. Sielaff, et al.,* No. 74–C–1918, and *Longstreet, et al. v. Sielaff, et al.,* No. 74–C–1951, were consolidated in the District Court. In *Arsberry,* nine prisoners challenged the constitutionality of their removal from the general population to segregation at Stateville and Joliet, or transfer from one of these prisons to segregation at another prison. In *Longstreet,* nine other prisoners challenged the constitutionality of their removal from the general population at Pontiac and Menard prisons and transfer to segregated confinement at Stateville.

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

The District Court granted plaintiffs' motion to certify the cases as class actions under Fed.R.Civ.P. 23,[1] and entered summary judgment in favor of the Department on December 30, 1976. We note jurisdiction under 28 U.S.C. § 1291, reverse the summary judgment and remand the causes for further proceedings.

### A. The Longstreet Case.

#### 1. Pontiac Plaintiffs.

Longstreet, Hall, Birdsong, Jackson, Moore and Weaver were summarily transferred to Stateville on March 27, 1974. All were previously in the general population at Pontiac except Weaver who was assigned to the Hospital. The plaintiffs alleged that the transfer was to "segregation" and that as a result thereof, they were deprived of their "rights" to associate with other inmates (First Amendment), attend religious services (First Amendment), visit the law library (Sixth Amendment), earn compensatory good time (state created entitlement), get adequate exercise and recreation, and participate in vocational and rehabilitational programs.

Affidavits filed by Warden Cannon and his special assistant, Revis, refer to the nature of the plaintiffs' confinement as 6 Gallery Cell House "B" or 6 Gallery or 6 Gallery in "B" House or the like. While the Department does not use the term "segregation," the description of the conditions of confinement differ only slightly from those alleged by the plaintiffs. Revis acknowledges that inmates in 6 Gallery were not in the general population of Cell House "B." He further states that materials from the law library were available upon request and that chaplains were also available. The only major departure from the complaint's allegations was his statement that inmates in 6 Gallery had the same opportunity to earn compensatory credit and statutory good time as those in the general population.

1. The class certified consisted of "[a]ll present or future inmates incarcerated in the Illinois State Penitentiary system who may be confined in segregation or in a like manner in any other such unit."

The plaintiffs' complaint does not specify the circumstances precipitating the transfers but the Simpkins affidavit, submitted by the Department in support of its motion for summary judgment, states that there was a series of disturbances in the inmates' dining room on March 26 and 27, that a "subsequent investigation" revealed that the disturbances were ordered by gang leaders, and that transfers of the plaintiffs were necessary to avoid further disruptions. The affidavit also states that transfers were resorted to because "stronger measures" than disciplinary actions were necessary to quell the turmoil. The parties agree that no *Wolff*-type[2] hearing was afforded before or after the transfers were effected.

The plaintiffs were kept in segregation at Stateville pending reclassification from March 27 until May 29. The two month delay in arranging "personal interview[s]" with the Institutional Assignment Committee was caused by the unexplained failure of the Pontiac officials to forward "the minimum information about the incident at Pontiac necessary to make a proper decision . . . ." The Pontiac plaintiffs submitted no affidavits.

### 2. *Menard Plaintiffs.*

It is agreed that there was a disturbance at Menard on May 17, 1974, in which guards were seized as hostages. Plaintiffs Brown, Bell and Bosveld were immediately placed in segregation. Four days later, on May 21, they were brought before the Menard Assignment Committee, told they were accused of participating in the takeover, and assigned to segregation.

The next day they were transferred to Stateville and appeared before the Stateville Assignment Committee on May 27 or 28. They were told that they were assigned to segregation for 90 days upon the recommendation of the Menard Assignment Committee. They were still in segregation on

September 4, 1974, when the *Longstreet* complaint was amended to include them as plaintiffs.

Brown, Bell and Bosveld alleged the same deprivations as did the Pontiac plaintiffs. The Department did not answer the complaint after it was amended to include the Menard plaintiffs nor did it submit any affidavits in support of the motion for summary judgment with respect to the Menard plaintiffs. In its brief to this Court, the Department acknowledges that the Menard plaintiffs did not receive compensatory good time "for the period in segregation." No affidavits were submitted by the Menard plaintiffs.

### B. *The Arsberry Case.*

### 1. *Stateville Plaintiffs.*

The Stateville plaintiffs, Arsberry, McLemore, and Frazier, alleged that in May and June of 1974, they were summarily removed from the general population. Arsberry was initially transferred to the Hospital Detention Unit, while McLemore and Frazier first went to the Transit Unit. Shortly thereafter, Arsberry and McLemore were moved to segregation where they remained until late August or early September, at which time Arsberry was released to the general population at Joliet and McLemore was released to the general population at Pontiac. Shortly after his transfer to the Transit Unit, Frazier was moved to the Behavioral Adjustment Gallery where he remained until his transfer in early October to the general population at Menard. Each of the plaintiffs filed affidavits which state in part that after their initial removal from the general population, the conditions of their confinement amounted to segregation. The affidavits also state that in each case their eventual release to the general population was ordered by the Administrative Review Board which found no basis for the

---

**2.** *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), where the Court sets forth the minimum due process requirements for prison disciplinary hearings. Such proceedings must include notice, written statements as to the evidence relied upon and the reasons for the action taken, and the opportunity to call witnesses and present documentary evidence. Additional procedures, as required in certain cases, are to be provided as appropriate. See pp. 563–72, 94 S.Ct. 2963.

assignments to segregation. The Stateville plaintiffs alleged the same deprivations as did the Pontiac and Menard plaintiffs.

Warden Cannon's affidavit detailed a number of disruptive incidents occurring prior to the organization of a boycott of the prison commissary in May, 1974. He further stated that "reliable information" established that Arsberry, McLemore and Frazier were responsible for enforcing the boycott through "threat and intimidation." He and his staff decided that immediate action had to be taken to protect the security of the institution and so decided to remove the plaintiffs from the general population pending investigation pursuant to Administrative Regulation (A.R.) 809.

"Shortly" after the removal of the plaintiffs from the general population each received a written statement to the effect that the action was taken because it was necessary "for the safety and security of the institution," that he was being held pending "investigation of [his] recent role in creating disturbances and other disruptive activities," and that he would "be scheduled for a hearing by the Institutional Assignment Committee as soon as the investigation is completed." This information was in the form of admissions by the Department and is relied upon by the Department.

Warden Cannon's affidavit indicates that each of the Stateville plaintiffs got a "hearing" before the Assignment Committee by the beginning of the second week in July. He states the 30–45 day delay was "because of the delay in reaching the conclusion of our investigation and [the Assignment Committee's] heavy caseload." Nothing in the record clearly establishes the nature of these "hearings." In fact, the only items in the record tending to reveal the nature of the hearings are responses to plaintiffs' requests for the production of records and therefore, do not come within the purview of Fed.R.Civ.P. 56(c). In addition, they apply to Arsberry and McLemore but not to Frazier. Furthermore, the Department often refers to these hearings as "personal interviews," distinguishing them from disciplinary hearings, and do not seriously contend that they satisfy the minimum standards set out in *Wolff.*

### 2. *Joliet Plaintiffs.*

The facts are the most sketchy and confused as to the Joliet plaintiffs Arsberry, Spencer, Murray, Stephens, Norris, O'Large and Dye. The complexity and confusion revolves primarily around the procedures followed by the Department during the four to eight months these plaintiffs were confined in segregation without a hearing complying with *Wolff* standards.

The plaintiffs again reiterate the allegations of their complaint, to wit, that they were summarily removed from Joliet's general population and placed in conditions amounting to segregation on April 21 or 22, 1975. About May 13 and at monthly intervals thereafter, each was informed by the Adjustment (disciplinary) Committee that he was considered to be a security threat and was being held in segregation pending the outcome of "a confidential investigation." (The other plaintiff groups were dealt with solely by assignment committee).

Two plaintiffs, Dye and Arsberry, were released to the general population in the last week of August or first week of September, 1975, without having received hearings. The others were held without hearings until December, 1975 or January, 1976. All alleged the same deprivations as did the Pontiac, Menard and Stateville plaintiffs. The Joliet plaintiffs were added to the *Arsberry* suit (Arsberry is both a Stateville and Joliet plaintiff) when the complaint was amended in November, 1975. The Department did not answer the amended complaint and submitted only one affidavit with respect to the Joliet plaintiffs.

To support its claim that the District Court properly granted summary judgment against the Joliet plaintiffs, the Department fleshes out the facts by reference to "agreed facts . . . based on the pleadings . . . which Judge Kirkland, on March 2, 1976, asked counsel to prepare . . . so that he could rule on plaintiffs' requests for injunctive relief." Plaintiffs

correctly point out in reply that there were no agreed facts; rather, the facts cited by the Department were merely the parties' representations of what they expected their proof to show. It obviously would be improper for the District Judge, for purposes of summary judgment, to rely on representations of the moving party or even on those of the opposing party to the extent he was attempting to counter properly considered evidence. *See King v. National Industries, Inc.*, 512 F.2d 29, 34 (6th Cir. 1975). However, there is no apparent reason why the District Court should not, in granting the motion for summary judgment, rely on the facts as stated by the party opposing the motion.

Thus, limited to the facts as represented in the plaintiffs' pleadings, the following background was established for the Joliet plaintiffs. On April 22, 1975, there was a disturbance in the West Cellhouse during which several inmate hostages were taken and another inmate, Herbert Catlett, was killed. As a result, the warden placed the entire institution on "lock-up" until May 6, 1975. On that day, 27 inmates, including the Joliet plaintiffs, were placed in segregation. On May 13 and on a monthly basis thereafter, the plaintiffs were brought before the Adjustment Committee and informed that they would be held in segregation as security threats pending the completion of a confidential investigation conducted jointly with the state police. The plaintiffs were held in segregation until they were "cleared" by this investigation. Dye was released to the general population on August 26 and Arsberry was transferred to Menard and released to the general population during the first week of September. Neither Dye nor Arsberry received a hearing complying with the requirements of *Wolff*. In December, inmate violation reports were issued for the remaining Joliet plaintiffs Stephens, Murray, Spencer, Morris and O'Large, and each was "found guilty" of participating in the April 22nd disturbance after disciplinary hearings held in December, 1975 and January, 1976. As a result, each of these plaintiffs was deprived of three to five years good time and demoted in grade. The plaintiffs concede that these hearings complied with the *Wolff* formalities.

According to an affidavit submitted by Joliet's assistant warden, at the time of the disciplinary hearings, each of the plaintiffs was also given a "segregation review hearing" in which it was found that he "continued to constitute a danger to the safety and security of the institutional community and for this reason each was continued in segregation." [3]

As with the Menard plaintiffs and Stateville plaintiffs Arsberry and McLemore, the Department does not contest that Joliet plaintiffs were denied the opportunity to earn compensatory good time credits while they were held in what is conceded to have

---

**3.** The pertinent passage in the Department's brief and the citation to this affidavit appear to distinguish between the disciplinary proceedings and the segregation review hearings. Accordingly, this may be an indication that prison officials considered the monthly segregation reviews to be classification rather than disciplinary proceedings. The potential significance of this will be seen. This apparent distinction is somewhat confusing in light of the claim at page 9 of the Department's brief that the monthly segregation reviews were conducted in conformity with A.R. 804 II B–9. A.R. 804, which governs the administration of discipline, was amended effective June 1, 1975 or about five weeks after the Joliet plaintiffs were removed to segregation and about two weeks after their first segregation review. The version of A.R. 804 effective prior to June 1, 1975 had no section II B–9. Nor did it have any section regarding periodic segregation review. In fact, prior to its amendment, A.R. 804 did not even provide for segregatory placement by the Adjustment (then Disciplinary) Committee. It merely provided for referral by the Adjustment Committee to the Assignment Committee for "possible re-assignment." (See A.R. 804(7)). The amended version of A.R. 804 does contain a section II B–9, but this section has nothing to do with segregation review. It details the requirements for a written statement of the decision in disciplinary proceedings. Section II C of the amended version of A.R. 804 does address the monthly review of segregation status. However, even a quick reading of this section reveals that it is intended to follow segregation ordered after a full disciplinary hearing. On the other hand, segregation imposed as a matter of classification pursuant to A.R. 807 requires review only every 90 days.

been segregation. Finally, no other affidavits were submitted with respect to the Joliet plaintiffs and, therefore, there is nothing to dispute the claimed limitation of associational, vocational, and religious activities and access to the law library.

This review of the factual situation reveals some of the divergencies that exist between the plaintiff groups and even subgroups. For example, while some of the plaintiffs (Stateville and Joliet) were removed from the general population pending investigations, others obviously were not (Pontiac and Menard). All plaintiffs alleged the deprivation of the opportunity to earn good time; the Department conceded the deprivation as to some (e. g., Menard, Joliet, Stateville [Arsberry and McLemore]), effectively denied the deprivation as to others with an affidavit (i. e., Pontiac), and denied it as to others without adequate evidentiary support (e. g., Stateville). All plaintiffs alleged deprivation of the opportunity to participate in religious programs and to use the law library, thus raising possible restrictions of First and Sixth Amendment rights calling for procedural due process. The Department concedes substantial restrictions in these areas for all plaintiffs. However, with respect to the Pontiac and Stateville plaintiffs (both groups segregated at Stateville), the Department submitted the Revis affidavits which stated, *inter alia,* that consultations with chaplains and law library materials were made available on request. No similar affidavit was submitted with respect to the Menard or Joliet plaintiffs.[4]

While there is much confusion and disagreement over what the record establishes with regard to the manner and nature of the confinement of the various plaintiff groups and even subgroups, there are also areas of agreement or at least where dispute is frivolous. For example: In each case, a disturbance preceded the decision to place the plaintiffs in segregation. Although the Department agrees that many of the plaintiffs were subjected to segregation and dispute that contention as to others, they have not substantially contested plaintiffs' allegations with respect to the conditions of confinement. Most did not earn compensatory good time. Nor were they permitted to participate in the various communal, vocational, educational, recreational, and religious programs available to the general population. With the exception of five of the seven Joliet plaintiffs, no other plaintiff received a *Wolff*-type hearing, either before or after removal from the general population. And even the five Joliet plaintiffs who eventually received adequate hearings did not receive them until they had spent at least eight months in segregation. None of the plaintiffs was subjected to less than two months segregation without a hearing. While many lost the opportunity to earn compensatory good time, none lost statutory good time without a *Wolff* hearing.

Finally, the defendants utilized classification procedure in placing the Pontiac, Menard, Stateville, and possibly the Joliet plaintiffs in segregation. This is true notwithstanding the fact that the motivation may have been to impose punishment for presumed participation in prison disturbances.

Notwithstanding the divergence in the record factual situations of the various plaintiff groups and subgroups, the District Court in granting summary judgment treated all the plaintiffs alike. The District Court found as follows:

"This Court finds that, under the circumstances, defendants were justified in removing plaintiffs from the general population pending investigation of the disturbances involved. The Court finds that plaintiffs suffered no 'grievous losses' during the periods of confinement that would have triggered procedural due process protections. Following completion of the investigations, plaintiffs were

---

4. It is true that the Menard plaintiffs were also segregated at Stateville and so were arguably subject to the same conditions of confinement. However, the Revis affidavits were directed to plaintiffs in holding classifications which the Department maintains differed from segregation.

afforded due process hearings in accordance with then effective AR804. The newly revised AR804 does not apply retroactively. *Wolff v. McDonnell, supra,* [418 U.S.] at 574 [94 S.Ct. 2963.]"

Thus the District Court failed to demonstrate that it recognized the differences in the factual situations or that if recognized, why they were deemed irrelevant. Moreover, the Court failed to come to grips with the theories on which the plaintiffs rested their claims of state law entitlement affording procedural due process.

*Procedural Due Process.*

The threshold question addressed by the parties is whether the segregation of any of the plaintiffs infringed a right of entitlement so as to trigger a right to procedural due process. The plaintiffs assert three general theories. First, they claim that segregation per se limits the exercise of First and Sixth Amendment rights to the point where procedural due process is required. Second, they claim the deprivations inherent in segregation constitute a grievous loss such that the Fourteenth Amendment, by its own force, imposes a requirement of procedural due process. Finally, they claim that a right to procedural due process is triggered by a state law entitlement guaranteeing prisoners freedom from the arbitrary imposition of segregation and loss of the opportunity to earn compensatory good time.

## I. *First and Sixth Amendment Rights.*

■ The plaintiffs suggest that restrictions, inherent in segregation, on their opportunity to attend general religious services and to associate with members of the general population are such as to require the imposition of procedural due process. It is also apparent from their brief that they would make a similar Sixth Amendment claim due to the limitation segregation necessarily places on their access to the prison law library. It is beyond doubt that the Constitution's First and Sixth Amendment freedoms extend inside prison walls. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Procunier v.*

*Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), and *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). However, it is equally clear that the Supreme Court gives substantial leeway to the discretion of prison authorities in this regard. As long as adequate alternatives are available in light of legitimate penological objectives, a limitation on a prisoner's constitutional rights will not be deemed impermissible. *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). All that is required is reasonable accommodation. *Cruz v. Beto,* 405 U.S. at 322, 92 S.Ct. 1079 n.2. Thus, to the extent segregation was properly imposed, all the state would need to establish here is some opportunity for the plaintiffs to exercise the protected rights. This much was shown through the Revis affidavits, at least with respect to the Pontiac and Stateville plaintiffs. A fair reading of the affidavits would net the same result as to the Menard plaintiffs who were also segregated in Stateville. The reasonable inference is that the same policy extended to the Joliet plaintiffs as to whom no affidavits were submitted on this point. The contention of plaintiffs is without merit.

## II. *Grievous Loss.*

The second constitutional claim urged by the plaintiffs met its death knell under the Supreme Court's recent decisions in *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), and *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976).

Under the grievous loss theory, the deleterious impact of a particular deprivation upon a prisoner's residuum of liberty could be so significant as to trigger the procedural protections engrained in the Fourteenth Amendment. A prime example of the application of the grievous loss theory may be found in *United States ex rel. Miller v. Twomey,* 479 F.2d 701 (7th Cir. 1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 102 (1974), in which this Circuit held that prolonged segregatory confine-

ment constituted a grievous loss necessitating the procedural protections of the Fourteenth Amendment.

 In *Meachum,* the Supreme Court held that other than liberty interests which "originate in the Constitution," a state prisoner must seek the source of a liberty interest in state law. 427 U.S. at 226, 96 S.Ct. 2532. Thus, *Meachum* means that a prisoner is not constitutionally entitled to procedural protections unless he establishes a constitutional right or he has some justifiable expectation rooted in state law that the challenged action will not be taken absent the occurrence of a specified factual predicate. *Montanye,* 427 U.S. at 242–43, 96 S.Ct. 2543.

The *Meachum* demise of the grievous loss theory as a source of liberty interests was noted and mourned in a dissent by Justice Stevens. Justice Stevens realized and deplored the fact that *Meachum* emasculated the view he expressed as a Circuit Judge in *Miller,* 427 U.S. at 235, 96 S.Ct. 2532.

The First Circuit has also implicitly realized that the grievous loss theory cannot support the finding of a liberty interest for prisoners placed in segregation. *See Four Certain Unnamed Inmates of Mass., etc. v. Hall,* 550 F.2d 1291 (1st Cir. 1977). *See also Walker v. Hughes,* 558 F.2d 1247, 1250–51 (6th Cir. 1977). The rationale underlying *Meachum* which dealt the death blow to the grievous loss theory has also been chronicled in numerous law review articles. *See, e. g.,* Calhoun, *The Supreme Court and The Constitutional Rights of Prisoners: A Reappraisal,* 4 Hastings Con.L.Q. 219 (1977); Note, *Two Views of a Prisoner's Right to Due Process: Meachum v. Fano,* 12 Harv. Civil Rights—Civil Liberties L.Rev. 405 (1977); Note, *Involuntary Interprison Transfers of State Prisoners After Meachum v. Fano and Montanye v. Haymes,* 37 Ohio State L.J. 845 (1976).

Plaintiffs argue that *Meachum* and *Montanye* merely establish a transfer rule and denounce the Department's broad construction of those cases as unwarranted. They rely on some language in *Meachum* and two of the Court's post-*Meachum* cases for the

conclusion that procedural protections are triggered where the grievous loss flows from segregation.

It is true that in *Meachum* the Supreme Court noted that "[n]one of the transfers ordered entailed . . . disciplinary confinement." 427 U.S. at 222, 96 S.Ct. at 2537. However, a reading of *Meachum* and *Montanye* establishes that the Court's rationale leaves no room in which "to identify a principled basis for differentiating between a transfer from the general prison population to solitary confinement and a transfer involving equally disparate conditions between one physical facility and another." 427 U.S. at 235, 96 S.Ct. at 2543 (Stevens, J., dissenting).

The plaintiffs' reliance on two post-*Meachum* cases in which this Circuit continued to questionably embrace the grievous loss theory is misplaced. In *Holmes v. United States Board of Parole,* 541 F.2d 1243 (7th Cir. 1976), this Court distinguished *Meachum* and held that the classification of a federal prisoner as a "special offender" constituted a grievous loss and triggered due process protections. The rationale of *Holmes* was overruled in *Solomon v. Benson,* 563 F.2d 339 (7th Cir. 1977). It is, however, significant to note that in *Holmes* the panel distinguished *Meachum* on the basis that established prison policy and guidelines created a justifiable expectation that special offender status would only be established following *Wolff*-type due process. 541 F.2d at 1252–53.

 The plaintiffs' claim that *Aikens v. Lash,* 547 F.2d 372 (7th Cir. 1976), established the proposition that an interprison transfer resulting in segregation constitutes a grievous loss requiring procedural protections in spite of the *Meachum* decision is also misplaced. *Aikens* grew up during the advent of *Meachum* and its reach is not as broad as plaintiffs suggest because of crucial concessions made by the defendants in that case. *Aikens* was before this Court on two occasions after the District Court ruled that procedural protections had to accompany interprison transfers resulting in segre-

gation and specified which protections were due. 371 F.Supp. 482 (N.D.Ind.1974). In reaching its conclusion, the District Court relied primarily upon *Miller.* On appeal, the state conceded that procedural protections were required and argued only that the District Court had gone too far. This Court affirmed. 514 F.2d 55, 57 n.5 (7th Cir. 1975). However, the Supreme Court, 425 U.S. 947, 96 S.Ct. 1721, 48 L.Ed.2d 191 (1976), vacated the judgment and remanded for reconsideration in light of *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). By the time *Aikens* was reconsidered, *Meachum* and *Montanye* had been decided and the panel was aware that the rationale underlying those decisions could undercut the threshold conclusion in *Aikens* that there was a liberty interest requiring due process. However, the Court did not need to meet this question in view of the state's concession that *Meachum* and *Montanye* were distinguishable since neither involved segregation. 547 F.2d at 373 n.1. Thus, plaintiffs incorrectly interpret *Aikens* as post-*Meachum* authority for the proposition that segregation alone is sufficient to trigger due process requirements.

III. *Entitlements Created Under State Law.*

The third theory on which the plaintiffs base their claims is that they enjoy certain state law entitlements, the deprivation of which triggers the procedural protections of the Fourteenth Amendment. Essentially, they claim that Illinois statutes, prison administrative regulations, and prison practices created rights to have the opportunity to earn compensatory good time, participate in educational programs, and be free of segregatory confinement.

■ *Meachum* and *Montanye* make it clear that the Supreme Court looks primarily to state law as the source of prisoners' liberty interests. Essentially a plaintiff must demonstrate a justifiable expectation that he will not be deprived of a benefit absent the occurrence of specified events. *Meachum,* 427 U.S. at 226–27, 96 S.Ct. 2532; *Montanye,* 427 U.S. at 242, 96 S.Ct. 2543.

The question then is what is sufficient to create the necessary justifiable expectation. In *Meachum* and *Montanye,* the Supreme Court failed to find a liberty interest in being free from interprison transfers to institutions with drastically less favorable conditions of confinement. The Court reviewed the state statutes involved and came up empty. Upon finding that the underlying statutes placed full discretion for transfers in the hands of prison officials, the Court concluded that there was no liberty interest to protect. In essence, prisoners must show some restriction upon the prison officials' discretion to remove the benefit sought. *Lombardo v. Meachum,* 548 F.2d 13 (1st Cir. 1977). In *Meachum* and *Montanye,* the Court indicated that the states could create the necessary entitlements "by statute, by rule or regulation, or by interpretation of their own constitutions." *Meachum,* 427 U.S. at 229, 96 S.Ct. at 2540.

In analyzing this problem, the Court of Appeals for the Sixth Circuit stated that "[i]n effect, *Meachum* equated the threshold test for the finding of a liberty interest with that for determining whether a property interest exists." *Walker,* 558 F.2d at 1251. After reviewing several Supreme Court cases in this area, including *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), in which the Supreme Court found an entitlement to tenured professorship implied in a teaching contract, the Sixth Circuit concluded that a prisoner's liberty interest, not provided for by statute, could alternatively be predicated on written prison policy statements. 558 F.2d at 1255.

This Court, on the other hand, through *Solomon,* limited the possible sources of state law entitlements. *Solomon* held that in the face of statutes previously held to grant full discretion to prison officials, prison policy statements and guidelines were insufficient to create a liberty interest. In fact, in dicta, the Court read *Meachum, Montanye* and *Moody* as requiring a statutory or constitutional basis for entitlements. 563 F.2d at 342–43.

This dicta in *Solomon* is inconsistent with the Supreme Court's language in *Meachum* that the state could create a liberty interest "by statute, by rule or regulation." 427 U.S. at 229, 96 S.Ct. at 2540. However, any limitations *Solomon* may have placed upon the scope of sources of state law entitlement have been taken from the board by the rationale and holding in *Durso v. Rowe,* 579 F.2d 1365 (7th Cir. 1978). The principal issue in *Durso* was "whether revocation of a prisoner's work-release status constitutes a deprivation of liberty protected by the Due Process Clause of the Fourteenth Amendment." (At p. 1367.) Pertinent to this case, the plaintiff in *Durso* alleged that "prison authorities customarily do not interfere with one's work-release status unless the participant violates some rule of the program or of his work-release contract." (At p. 1371.) The District Court dismissed the complaint for failure to state a claim and for lack of subject matter jurisdiction, with the conclusion that Durso had shown no protected liberty interest. *Durso v. Rowe,* 430 F.Supp. 49 (N.D.Ill.1977). This Court on appeal reversed and remanded with the succinct holding, *without reference to Solomon,* that "[t]he predicate necessary to trigger the Due Process Clause is not restricted to statutorily-created rights; it may also be found in *official policies or practices."* (Emphasis added) (At p. 1369.) Thus *Durso* places this Circuit consistent with *Walker* of the Sixth Circuit and the Supreme Court's decisions in *Meachum* and the more recent summary affirmance in *Enomoto v. Wright,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). In *Enomoto,* a three-judge District Court held that an administrative regulation of the California Department of Corrections was sufficient to create an entitlement that prisoners would not be placed in segregation absent a specified factual predicate. On that basis, the Court held that prisoners could not be segregated without procedural protections required in *Wolff.*

As pointed out above, the plaintiffs here allege that Illinois statutes, prison administration regulations, and prison practices create rights to have the opportunity to: (a) earn good time, (b) participate in educational programs, and (c) be free from arbitrary segregated confinement.

■ (a) The plaintiffs do not argue on appeal that they have any statutory or administrative regulatory state law entitlement to earn good time. They concede that the single good time State of Illinois statute, Ill.Rev.Stat. ch. 38 § 1003–6–3(a), does no more than to authorize the Department of Corrections to promulgate regulations governing the diminution of sentences on account of good conduct or meritorious service. They also concede that throughout the critical period the Department of Corrections had not promulgated any regulation governing good time. Rather they argue that under the rationale of *Perry v. Sindermann,* they enjoy a state law entitlement to good time based upon institutional policy and custom. This contention of the plaintiffs is, under the facts before the District Court, without merit. The record before the District Court is devoid of evidence of any extant institutional practice or custom related to the allowance of good time. Hence, the District Court did not err in granting the summary judgment on this issue in favor of the Department.

It now appears in the briefings of the parties before us that there did exist at the pertinent times some four intra- and interinstitutional directives providing guidelines for allowing and denying compensatory and custodial good time in the event of the segregation of a prisoner. These directives were not known to the plaintiffs and they were thus prevented in making the same a part of the record before the District Court.

■ In view of the ultimate remand of the causes and in the furtherance of justice, the summary judgment on the issue of the loss of good time during the segregation periods of the various plaintiffs is vacated and the issue is remanded to the District Court for further evidentiary hearing and adjudication as to whether such directives create any state law entitlements in favor of the plaintiffs.

(b) The plaintiffs' claim of a loss of participation in educational programs, unlike their loss of good time argument, is based upon an Illinois statute cited as Ill. Rev.Stat. ch. 38 § 1003–6–2(d). However, the statute cited does not condition withdrawal of access to educational programs upon specified events. Rather this statute is obviously the type of general policy statement which is insufficient to create an entitlement. *See Lombardo v. Meachum,* 548 F.2d at 15.

(c) The plaintiffs' claim of freedom from segregation short of due process per *Wolff* is based upon A.R. 807, which provides in part that "[s]egregation is a classification category for inmates in Adult Division institutions. Inmates may be placed in a segregation classification by the Institutional Assignment Committee or Program Team if they:

"1. Indicate a chronic inability to adjust in the general prison population.

"2. Constitute a serious threat to the security of the institution.

"3. Require maximum protection for themselves or if others require maximum protection from them."

The Department argues that the segregation decisions made for all the plaintiffs were classification decisions. It is on that basis that they attempt to justify the failure to provide hearings meeting their own requirements for disciplinary proceedings.

[11] The Department does not explain why this section does not create a justifiable expectation that one will not be placed in segregation absent a finding that he falls within one of the three specified categories. Rather, they merely say that this regulation does not condition segregation on particular acts of misconduct. Nothing in *Meachum* says that the necessary specified events are limited to forms of misconduct. The De-

partment attempts to rely on other regulations such as A.R. 809 which permits temporary segregation on an emergency basis pending investigation with the express concurrence of the Administrator of Adult Division Services. However, with the possible exception of the Stateville plaintiffs, the Department submitted no evidence which would support a foundation for summary judgment that A.R. 809 was the basis of any of the removals to segregation or that the terms of A.R. 809 were complied with. The District Court, through its narrow reading of *Meachum,* erred in granting summary judgment on this claim.

The decision as to whether A.R. 807 created an entitlement is, of course, a matter of state law. The Illinois statutes governing the conditions of imprisonment were completely revised in 1972, apparently with a view toward more clearly delineating prisoners' rights. McAnany, *Imprisonment Under the Illinois Unified Code of Corrections: Due Process, Flexibility, and Some Future Doubts,* 49 Chicago-Kent L.Rev. 178 (1972). In the few intervening years since this comprehensive overhaul of the Code of Corrections, there has been very little interpretation of it by the Illinois Supreme Court. The parties have cited and we have found no Illinois court adjudication on point either on the facts or on the pertinent statutory sections.[5]

We believe the better practice is for the District Court on remand to have the first opportunity to consider and determine whether A.R. 807 creates a state law entitlement deserving of due process protection. We accordingly reverse the summary judgment on this issue and remand the cause to the District Court for evidentiary hearing and further proceedings in view of *Durso* and consistent herewith.[6]

REVERSED AND REMANDED.

---

5. Although the Illinois Supreme Court has not ruled directly on prisoners' due process rights upon transfer or assignment to segregation, two recent decisions indicate that it will not intrude on the Department of Corrections' broad discretionary powers to control the conditions of confinement. *See People v. Wil-*

*liams,* 66 Ill.2d 179, 5 Ill.Dec. 582, 361 N.E.2d 1110 (1977); *In re Washington,* 65 Ill.2d 391, 3 Ill.Dec. 723, 359 N.E.2d 133 (1976).

6. We make no suggestion that this issue is or is not an appropriate issue calling for abstention on the part of the District Court for an Illinois

state court adjudication of the state law entitlements issue, with a reservation of the due process issue. *See England v. Louisiana State Board of Medical Examiners,* 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Railroad Comm'n of Texas v. Pull-* *man Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Lehman Bros. v. Schein,* 416 U.S. 386, 389–91, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974); and Ill.Rev.Stat. ch. 110 § 57.1(1).