Robert WELLMAKER, Plaintiff,

v.

Howard DAHILL, et al., Defendants.

No. 5:92 CV 0376.

United States District Court,
N.D. Ohio, E.D.

Nov. 5, 1993.

Robert Wellmaker, pro se.

Joy S. Wagner, Barberton, OH, for plaintiff.

R. Paul Cushion, II, Office of the Atty. Gen., Cleveland, OH, for defendants.

### *ORDER*

SAM H. BELL, District Judge.

Presently before the Court is Defendants' second motion to dismiss, or, in the alternative, motion for summary judgment. (Docket # 29). The parties have filed several briefs arguing the merits of Defendants' motion.

### BACKGROUND

Plaintiff has been incarcerated at the state correctional institution in Mansfield, Ohio since November of 1990. He professes to be a follower of the Nubian Islamic Hebrew faith, the tenets of which require him to keep his hair uncut and braided. Defendants are employees of the correctional facility.

Plaintiff alleges, and the Defendants do not deny, that during the course of his imprisonment, he has been forced by Defendants to comply with a facility rule limiting the length of inmates' hair, despite his religious convictions. At one time, Defendants placed Plaintiff in segregation for his non-compliance, and on two occasions Plaintiff's hair was actually cut by the Defendants.

Plaintiff instituted this lawsuit on February 25, 1992. He filed an amended complaint in August of the same year, listing three causes of action under 42 U.S.C. § 1983. In his first cause of action, Plaintiff asserts a claim for the infringement of his First Amendment right to exercise his religion freely. In his second cause of action, he alleges a violation of the Eighth Amendment's prohibition of cruel and unusual punishment, together with a deprivation of Fourteenth Amendment due process. Finally, in his third cause of action, Plaintiff contends that he has been denied equal protection of the laws in violation of the Fourteenth Amendment.

Defendants have moved this Court to dismiss Plaintiff's complaint pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Alternatively, Defendants move for summary judgment under Fed.R.Civ.P. 56, including a claim of qualified immunity within their motion.

## STANDARD OF REVIEW

■ Federal R.Civ.P. 12(c) states in relevant part:

If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Since Defendants have filed both a memorandum and an affidavit supporting their motion, as has Plaintiff in opposition the Court will properly treat Defendants' motion strictly as a motion for summary judgment. *Janice Leather Imports Ltd. v. U.S.*, 391 F.Supp. 1235 (S.D.N.Y.1974); *International Union United Auto., Aircraft and Agric. Implement Workers of America, Local No. 283 v. Wisconsin Motor Corp.*, 266 F.Supp. 899 (E.D.Wis.1967).

In reviewing a motion for summary judgment, a court must consider the pleadings, related documents, evidence, and all reasonable inferences in a manner most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979). Rule 56 provides, in relevant part, as follows:

(c) ...

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

. . . . .

(e) ...

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Three Supreme Court cases have provided guidance as to the nature of the respective burdens allocated under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The ultimate burden lies with the non-moving party to show the existence of a genuine issue of material fact. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts

... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Fed.Rule Civ.Proc. 56(e)." *Matsushita,* 475 U.S. at 586–587, 106 S.Ct. at 1356 (emphasis supplied). "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The court in *Anderson* held that "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff had had a full opportunity to conduct discovery." *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514.

On the other hand, the moving party's burden under Rule 56 is lighter.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule 56(c) ... suggests the absence of such a requirement.

*Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis supplied).

The Sixth Circuit Court of Appeals, in *Street v. J.C. Bradford and Co.,* 886 F.2d 1472 (6th Cir.1989) recently reviewed court decisions and commentary regarding the impact of *Anderson, Celotex,* and *Matsushita* on summary judgment practice. The court concluded that a "new era" in summary judgment practice has opened in the court system as a result of these opinions.

Scholars and courts are in agreement that a "new era" in summary judgments dawned by virtue of the Court's opinions in these cases ... On the whole, these decisions reflect a salutary return to the original purpose of summary judgments. Over the years, decisions requiring denial of summary judgment if there was even a suggestion of an issue of fact and tended to emasculate summary judgment as an effective procedural device.

*Street, supra,* at 1476.

The court enunciated the following "new era" principles, among others: as on federal directed verdict motions, the "scintilla" rule applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion; the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment"; the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Id.* at 1479–1480 (footnotes and citations omitted).

## LAW AND ANALYSIS

Title 42 U.S.C. Section 1983 provides a cause of action for an aggrieved party against one who deprived the claimant of protected rights while acting under color of state law. It reads in pertinent part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State of Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C.A. § 1983. To maintain an action under this section, Plaintiff need prove two things. First, he must show that he has been deprived of rights, privileges or immu-

nities secured by the Constitution and laws of the United States. Additionally, he must establish that Defendants' acts, which allegedly deprived him of his protected rights, were under color of state law. *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); *Zamlen v. City of Cleveland*, 906 F.2d 209 (6th Cir.1990), *cert. denied*, 499 U.S. 936, 111 S.Ct. 1388, 113 L.Ed.2d 444((1991). Defendants all work as employees at the Mansfield Correctional Institution (First Dahill Affidavit at ¶ 1; Minard Affidavit at ¶ 1; Hurrel Affidavit at ¶ 1), and thus, act under color of state law. The question remaining, then, is whether any issue of material facts exists concerning whether Plaintiff was deprived by Defendants of a right, privilege or immunity protected by the Constitution or laws of the United States.

### 1. The First Amendment Claim.

■ To state a free exercise claim under the First Amendment, Plaintiff must establish: (1) that the practice he seeks to protect is religious within his own "scheme of things"; (2) that his religious conviction is sincerely held; and (3) that the behavior of the Defendants infringes upon his religious practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1225 (6th Cir.1987).

■ In his affidavit, Plaintiff states that he is a member of the Nubian Islamic Hebrew faith and has taken a vow that requires him to refrain from cutting his hair. (Wellmaker Affidavit ¶¶ 3, 7). He also avers that Defendants forced him to cut his hair on two separate occasion, interfering with his religious practice. (Wellmaker Affidavit ¶ 9).

■ Plaintiff's averments support a First Amendment claim under the requirements set out in *Kent*. Having said this, however, the Court must also consider whether the restriction challenged by Plaintiff is reasonably related to legitimate penological interests. If that inquiry is answered in the affirmative, then the restriction is constitutionally permissible, and Defendants' motion for summary judgment must be granted. *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Pollock v. Marshall*, 845 F.2d 656, 658 (6th Cir.1988), *cert. denied*,

488 U.S. 987, 109 S.Ct. 239, 102 L.Ed.2d 228 (1988), *rehearing denied*, 488 U.S. 987, 109 S.Ct. 545, 102 L.Ed.2d 575 (1988); *Kent*, 821 F.2d at 1225.

■ The Supreme Court in *Turner* identified four factors to be considered in determining whether a prison regulation impinging on a constitutional right relates to legitimate penological interests:

> First, the prison regulation must have a valid and rational connection to the legitimate and neutral government objective put forward to justify it. Second, the court must determine whether there are alternative means of exercising the right that remains [sic] open to prison inmates. Third, the court should consider the impact that accommodating the asserted constitutional right will have on the guards and other inmates, and on the allocation of prison resources. The fourth factor is whether there are ready alternatives to the prison regulation.

*Pollock*, 845 F.2d at 658, *citing Turner*, 482 U.S. at 89–90, 107 S.Ct. at 2262. These factors serve as guidelines to be weighed and balanced in a proper evaluation of the challenged regulation; they do not amount to prongs of a four part test, each of which must be met. *Munir v. Scott*, 907 F.2d 151 (6th Cir.1990).

*Pollock* involved facts quite similar to those presently before this Court. Pollock, an inmate, adhered to the religion of the Lakota Native Americans, who believe that hair is sacred and, therefore, should not be cut. *Pollock*, 845 F.2d at 657. Under Ohio Administrative Code Regulation 5120–9–25(F), a prison inmate must keep his hair within a prescribed length unless a management officer excuses the inmate from the requirement due to conflicts with the inmate's religious beliefs. The prison superintendent refused to grant Pollock an exemption; instead, he forced Pollock to submit to a haircut, causing Pollock to sue him pursuant to 42 U.S.C. § 1983. *Id.* The official filed a motion for summary judgment, claiming that valid penological interests exceeded Pollock's First Amendment, free exercise right. That motion was granted. *Id.*

The court of appeals reviewed the constitutionality of the prison regulation in light of the four factors enumerated in *Turner*. *Id.* at 658. In determining whether the regulation had a rational connection to a legitimate and neutral government objective, the court relied heavily on an affidavit submitted by the superintendent, in which he explained the various penological interests served by the regulation. Included among the objectives were "removal of a place to hide small contraband [and] prevention of sanitation problems and homosexuality." *Id.* at 659. The court found the advanced interests "to be both legitimate and reasonably related to the regulation limiting the length of prisoners' hair." *Id.*

Turning to the second factor—whether the plaintiff had alternative means of practicing his religion—the court noted that Pollock remained free to exercise his religious faith in all respects save for the requirement that he cut his hair. *Id.* The third factor identified in *Turner* was the potential impact upon guards, other inmates and prison resources that would result if the prisoner were excused from the regulation. The *Pollock* court credited the superintendent's testimony that long hair created a sanitation and safety risk for other inmates, increased homosexuality and reduced the time prison guards had to attend to other security needs. *Id.* Based on this testimony alone, the court concluded, "Accommodating the plaintiff's first amendment interest could, it appears, adversely impact the prison environment." *Id.*

Before considering the availability of ready alternatives to the regulation, the court in *Pollock* stressed that this fourth factor did not create a "least restrictive alternative" test for prison officials: "[P]rison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 659, *quoting Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262.

Pollock suggested that he could keep his hair clean and pulled back in a pony tail as an alternative to cutting it to regulation length. But the Court of Appeals determined that this alternative failed to satisfy completely the various penological interests served by the regulation. *Id.* The court observed that Pollock might still hide contraband in his hair and that his hair still posed a threat to sanitation since it was likely to clog sink and shower drains. *Id.*

After considering each of the four *Turner* factors, the Court of Appeals concluded:

> After balancing the defendant's interest in keeping prisoners' hair short against the right of the plaintiff to exercise the religion of the Lakota Indians, we hold that the regulation restricting hair length, as applied to the plaintiff, is not unconstitutional.

*Pollock*, 845 F.2d at 659–660. *See also, Campbell v. Purkett*, 957 F.2d 535 (8th Cir. 1992) (finding that prison's prohibition against inmates wearing long hair did not violate free exercise rights of Nazirite). Clearly, the decision in *Pollock* mitigates strongly against finding in Plaintiff's favor on his First Amendment claim.

The Sixth Circuit Court of Appeals has admonished the district courts for failing to make "specific factual findings regarding the four factors" set out in *Turner* when determining whether a challenged regulation relates reasonably to legitimate penological interests. *Munir*, 907 F.2d at 151. Accordingly, this Court will consider each of the four factors in light of the limited evidentiary material submitted by the parties, despite the fact that the parties themselves have not squarely addressed the *Turner* standard.

■ Under *Turner*, it must be determined whether the conduct of Defendants in enforcing an institutional restriction on the length of Plaintiff's hair was reasonably related to legitimate penological interests. The defendants have submitted several affidavits articulating the various penological interests that are benefitted by the regulation concerning inmates' hair length. Defendant Dahill's affidavit is typical:

> Long hair/braids are restricted from being worn by any inmate, regardless of race, creed, national origin or any other irrelevant reason. The wearing of long hair/braids by an inmate poses a serious risk to the continued security and safety of

the staff, the institution and the inmates at Mans. C.I. Braids/long hair is unsanitary as inmates with braids do not wash their hair, thereby assuring a "natural" look. This failure to cleanse is a fertile environment for insects and bacteria. Also the wearing of braids have [sic] been perceived by some inmates as the wearing of one's "colors" (gang recognized symbols). This causes violence between inmates. Also, due to the thickness and length of the inmate's hair, when braids/long hair are worn, an inmate could very easily hide contraband and weapons in his hair. For obvious reasons, this poses a serious risk to the continued safety and security of the prison environment. Furthermore, long hair in prisons has become synonymous with homosexuality. Therefore, to avoid all problems associated with homosexuality in prison, braids/long hair must be restricted.

(First Dahill Affidavit at ¶ 5). In a supplemental affidavit, Defendant Dahill declared that if an inmate were exempted from the regulation governing hair length, he might be perceived as receiving preferential treatment and thus be exposed to attacks by other inmates. (Second Dahill Affidavit at ¶ 3). Additionally, Dahill stated that long hair creates sanitation problems by clogging drains. (*Id.* at ¶ 9). In yet a third affidavit, Dahill said that long hair hinders quick inmate identification, is more likely to get caught in machinery and increases the time required of officers to perform security searches. (Third Dahill Affidavit at ¶¶ 5(a),(b),(c),(e),(f) & (h)).

In response, Plaintiff points to the Sixth Circuit Court of Appeals' opinion in *Weaver v. Jago,* 675 F.2d 116 (6th Cir.1982), in which the court remarked: "[T]he state must do more than simply offer conclusory statements that a limitation on religious freedom is required for security, health or safety in order to establish that its interests are of the 'highest order.'" *Id.* at 119.

Standing in isolation, the language in *Weaver* weighs against a decision granting summary judgment in Defendants' favor at this time. But since announcing its decision in *Weaver,* the Court of Appeals for the Sixth Circuit has revisited the question in *Pollock,*

in which case it implemented the new standard for deciding prisoners' constitutional claims. Given that *Pollock* represents the more recent and the more fulsome treatment of the issues presented, the Court feels compelled to rely on its instruction rather than apply too rigidly the loose language in *Weaver* invoked by Plaintiff.

This being the case, the Court cannot conclude that the affidavits offered by Defendants constitute mere conclusory statements; the *Pollock* court based its review on a nearly identical affidavit. In fact, the court specifically approved a restriction on hair length as a promotion of interests identical to those listed in Defendants' affidavits:

> Quick identification, removal of a place to hide small contraband, prevention of sanitation problems and homosexuality, and reduction of contact between prisoners and guards are all legitimate penological interests that are furthered by requiring inmates to keep their hair short.

*Pollock,* 845 F.2d at 659.

Plaintiff distinguishes *Pollock* by pointing out that the inmate in that case failed to question the legitimacy of the interests advanced by the defendant to justify the regulation. *Id.* In contrast, Plaintiff argues, he has offered affidavit testimony disputing the rational connection between the challenged regulation and the interests purportedly served.

■ Admittedly, Plaintiff's affidavit, together with Defendants' somewhat piecemeal recitation of the interests judicially approved in *Pollock,* calls into question the nexus in this particular case between the challenged restriction and some of the specific interests it purportedly serves. Plaintiff's testimony based on his personal experiences in prison creates at least a factual dispute as to whether long hair in any way promotes homosexuality or gang membership at Mansfield Correctional Institute as claimed by Defendants. (Wellmaker Affidavit at ¶¶ 13 & 15). Nevertheless, the Court must conclude that many of the interests advanced by Defendants and deemed legitimate in *Pollock* may reasonably be promoted by, and therefore justify, the restriction in this instant case. For example,

the fact that Plaintiff personally keeps his hair clean and is unable to hide contraband therein (Wellmaker Affidavit at ¶¶ 12 & 14) does nothing to guarantee that the same is true for other inmates. Thus, the rationale of the general policy as a mean of ensuring sanitation and safety remains.

The second factor to consider is whether Plaintiff has alternative means of exercising his First Amendment right. Initially, the Court notes that it is unclear whether all members of Plaintiff's religious faith must keep their hair uncut, or whether Plaintiff has voluntarily taken a special vow of piety that requires him to remain unshorn. (*See* Wellmaker Affidavit ¶¶ 6 & 7). In any event, as was true in *Pollock*, it appears that the challenged regulation allows Plaintiff to practice his faith in all respects save obeying the dictate that he refrain from cutting his hair.

Next, the Court must study the potential effect upon other inmates, guards and prison resources of allowing Plaintiff to grow out his hair. As noted, Defendant Dahill asserts in an affidavit that exempting Plaintiff from the regulation could be interpreted by other inmates as a showing of preferential treatment, triggering physical attacks upon Plaintiff. Plaintiff responds to this argument by pointing out that in the period preceding his forced hair cuts, when his hair was in fact long, he never suffered attack. (Second Wellmaker Affidavit at ¶ 7). Plaintiff fails to consider, however, that at that time he was likely viewed by the general prison population as one resisting authority, not as a favorite specially excused from institutional requirements. It is quite conceivable that he would be treated differently by fellow prisoners under the latter circumstance.

Additionally, the Court must always be mindful of the teachings of *Pollock*. The Court of Appeals there found that long hair had the potential to interfere with inmate identification, sanitation and the efficient use of guards' time—considerations raised in the present case—thereby adversely affecting the prison environment. Upon consider-

ation, the Court agrees that a decision exempting Plaintiff from the reach of the challenged regulation could have an unfavorable impact upon the general prison environment.

Finally, the Court asks whether there is a readily available alternative to the prison regulation that will accommodate the plaintiff's rights at a *de minimis* cost to valid penological interests. Plaintiff maintains that he keeps his hair clean, thereby removing any sanitation concerns prison officials may have. Were personal hygiene the sole interest protected by the regulation, simply requiring Plaintiff to maintain his diligence in his personal care might seem an acceptable alternative. Yet, as emphasized in *Pollock*, hygiene is not the sole interest. Any acceptable alternative must take into account the increased inspection guards must give inmates with long hair [1], difficulties with quick identification and the sanitation problems created by clogging drains. *See Pollock*, 845 F.2d at 659. While the burden on prison officials might appear *de minimis* as it relates to Plaintiff alone, the Court cannot ignore the likelihood that other inmates would seek an exception from the regulation were one given to Plaintiff, multiplying the weight of the burden significantly.

Having considered the evidence before it, and mindful of the Sixth Circuit Court of Appeals' recent pronouncement in *Pollock*, the Court finds that the regulation restricting hair length, as enforced by Defendants, withstands First Amendment challenge. Therefore, summary judgment must be granted for Defendants as to count one of Plaintiff's amended complaint.

### 2. The Eighth and Fourteenth Amendment (Due Process) Claim.

In his second cause of action, Plaintiff asserts that, by placing him in segregated confinement for nineteen days, Defendants deprived him of his Eighth Amendment right to be held free of cruel and unusual punishment, as well as his Fourteenth Amendment

---

1. Although Plaintiff insists that he cannot hide contraband in his hair (First Wellmaker Affidavit at ¶ 14), common sense suggests that the longer hair is, the more easily it conceals items within or beneath it. Although the Court by no means questions the veracity of Plaintiff's statement, it nonetheless cannot require prison officials to take inmates generally at their word as to the concealment of contraband without an actual inspection when it appears necessary.

right of due process. (Amended Complaint at ¶¶ 9–11).

■ The Eighth Amendment prohibition of cruel and unusual punishment shields prisoners from punishment that involves the unnecessary and wanton infliction of pain. *Ivey v. Wilson,* 832 F.2d 950, 954 (6th Cir.1987), *citing Rhodes v. Chapman,* 452 U.S. 337, 345, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981). However, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Id.*

■ Punitive confinement of a prisoner who has violated an institutional rule is not of itself cruel and unusual punishment. *See Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2571, 57 L.Ed.2d 522 (1977), *rehearing denied,* 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979) ("[P]unitive isolation 'is not necessarily unconstitutional....' It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual."); *Jihaad v. O'Brien,* 645 F.2d 556, 563 (6th Cir.1981) ("There was no proof that seven days' disciplinary segregation for refusal to follow an order ... was cruel or unusual punishment.").

■ Plaintiff's Eighth Amendment claim quite obviously depends on his First Amendment claim. Were the regulation requiring Plaintiff to cut his hair unconstitutional, punishment meted out to enforce that regulation would most likely also be unconstitutional. Having upheld the constitutionality of the regulation, however, the Court will not forbid its enforcement, absent evidence that the sanction employed involves the unnecessary or wanton infliction of pain or is disproportionate to the violation committed. *Ivey,* 832 F.2d at 954. Plaintiff has not argued, nor is there any evidence to suggest, that the length or conditions of his confinement by their nature constituted cruel and unusual punishment. For these reasons, Defendants' motion for summary judgment must be granted as to Plaintiff's Eighth amendment claim.

■ also includes a Fourteenth Amendment due process claim within his second cause of action. He argues that Defendants' conduct amounted to a violation of substantive due process under the Fourteenth Amendment insomuch as it "shocks the conscience." (Brief in Opposition at 9).

In a recent case before the Sixth Circuit Court of Appeals, a prisoner contended that his reclassification and transfer to a higher security facility violated his substantive due process rights. *Newell v. Brown,* 981 F.2d 880, 885 (6th Cir.1992), *cert. denied,* —— U.S. ——, 114 S.Ct. 127, 126 L.Ed.2d 91 (1993). In rejecting his argument, Judge Nelson, writing for the court, commented upon the ambiguity surrounding substantive due process claims:

> We do not doubt that the concept of substantive due process—that "durable oxymoron," as Judge Posner has called it—continues to influence the thinking of the Supreme Court. Virtually every member of the Court has acknowledged that the Due Process Clause does have a substantive component, however difficult it may be to discern its contours. But nothing in the circumstances of the case before us suggests to us that there has been a violation of any substantive rights conferred by the Due Process Clause
>
> . . . .
>
> As a matter of current constitutional law, there are contexts in which it is widely believed that one's substantive due process rights may be violated by conduct that "shocks the conscience," [citations omitted] and offends "those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." [Citations omitted]. The procedure through which the plaintiff in this case was reclassified and assigned to another prison certainly does not shock our conscience, if that be thought relevant, nor does the procedure offend any canons of decency and fairness of which we are aware.

*Id.*

Plaintiff's Fourteenth Amendment claim must fail for virtually the same reason as

does his Eighth Amendment claim. This Court has already determined that the defendants were implementing a lawful regulation. To reiterate an earlier point, it is not the Court's function to restrict enforcement of a lawful regulation, so long as the method of enforcement is itself legitimate. Here, Plaintiff offers no evidence to indicate that the Defendants' method of enforcement was shocking to the conscience. Although the derogatory and vindictive remark Plaintiff attributes to Defendants Dahill and Minard (First Wellmaker Affidavit at ¶ 10) is unbeseeming state officials, it alone does not give rise to a cause of action under 42 U.S.C. § 1983 and the Fourteenth Amendment. *See, e.g., Stacey v. Ford,* 554 F.Supp. 8 (N.D.Ga.1982) (holding that allegations of threats and verbal abuse by prison officials do not state cause of action under 42 U.S.C. § 1983). Taken as a whole, Defendants' alleged conduct simply fails to shock the Court's conscience or to offend historic canons of decency and fairness. Nor can it be termed "arbitrary and capricious" given the legitimate penological interests which it serves. Thus, Defendants' motion for summary judgment must be granted as to the Fourteenth Amendment component of Plaintiff's second cause of action.[2]

### 3. The Fourteenth Amendment Equal Protection Claim.

■ In his third cause of action, Plaintiff specifically alleges:

Defendants' failure to recognize Plaintiff's professed religion as a legitimate religious faith and failure to permit Plaintiff to exercise the practices associated with that religion violated Plaintiff's right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

(Amended Complaint at ¶ 13). Unfortunately, Plaintiff provides no additional articula-

tion of the grounds supporting his equal protection claim. In his second affidavit, he states generally, "The Mansfield Administration does allow other inmates to receive 'preferential' treatment where religious beliefs are involved." (Second Wellmaker Affidavit at ¶ 8). To support an equal protection claim, however, Plaintiff must provide more than a scintilla of evidence of discrimination in the enforcement of the prison regulations. *See Ustrak v. Fairman,* 781 F.2d 573, 576 (7th Cir.1986) (Posner, J.) ("A prima facie case ... under the equal protection clause of the Fourteenth Amendment ... requires proof of a state of facts that makes it more likely than not that there has been discrimination.").

■ Roughly speaking, an equal protection claim alleges either: (1) that a challenged statute or regulation discriminates on its face; or (2) that, although facially neutral, the regulation has a disparate impact on a given group; or (3) that the facially neutral regulation is being unequally administered by the defendants. *E & T Realty v. Strickland,* 830 F.2d 1107 (11th Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988), *citing* J. Nowak, R. Rotunda & J. Young, *Constitutional Law* at 600 (2d. ed. 1983).

Plainly, the Mansfield Correctional Institution's rule requiring inmates to keep their hair above a certain length is not facially discriminatory, and Plaintiff does not claim otherwise. Likewise, Plaintiff offers no evidence of disparate impact, and none would be expected (save perhaps a showing that the large group of inmates with scalp hair suffer adversely under the rule compared to the presumably smaller set of prisoners who are entirely bald).

■ As the allegations and evidence put forward by Plaintiff plainly do not support an equal protection claim under either a facial discrimination or a disparate impact theory,

---

**2.** Plaintiff has not argued that Defendants abridged his Fourteenth Amendment right to procedural due process, and there is no evidence before the Court to sustain such a claim in the face of a motion for summary judgment. In *Walker v. Hughes,* 558 F.2d 1247 (6th Cir.1977), the court concluded that an inmate does not have a protected liberty interest that prevents prison

officials from placing him in punitive segregation *unless* such an interest has been created by the rules and regulations of the prison. *Id.* at 1252–54. Plaintiff offers no evidence indicating that such an interest has been created in this case, nor does he present evidence to show that he was deprived of procedural due process before being placed in the segregated unit.

the Court must presume that Plaintiff means to advance a claim based on selective application. He contends generally that inmates adhering to other religious faiths "receive 'preferential' treatment where religious beliefs are involved." (Second Wellmaker Affidavit at ¶ 8). If it were true that the rule governing hair length had been selectively enforced against Plaintiff, then he could successfully argue that he had been denied the equal protection of the laws afforded him by the Fourteenth Amendment. *Birth Control Centers, Inc. v. Reizen,* 743 F.2d 352, 359 (6th Cir.1984). But Plaintiff offers no evidence of selective enforcement of this or any other specific rule or regulation. Instead, he apparently takes issue with the prison officials' decision to allow exemptions to some regulations while uniformly enforcing other, unrelated regulations. As the analysis of Plaintiff's First Amendment claim makes clear, prison officials may, and indeed must, excuse inmates from complying with institutional rules that infringe upon their free exercise right *unless* the regulation is reasonably related to legitimate penological interests. It is perfectly reasonable for prison officials to conclude that granting limited exceptions to certain regulations will not hinder legitimate penological interests, but that other regulations must be enforced uniformly. Therefore, to challenge the strict enforcement of one rule simply because exceptions are made to others is, stated colloquially, to compare apples and oranges.

Finally, even if the plaintiff were able to demonstrate an equal protection violation, the grooming regulation would in all likelihood be upheld since the Court has already determined that it is reasonably related to legitimate penological interests. *See Campbell,* 957 F.2d at 537 (holding that prison rule limiting hair length is reasonably related to legitimate penological interests and therefore survives equal protection challenge).

For these reasons, summary judgment on the third cause of action must be granted to Defendants as a matter of law.

### 4. Qualified Immunity.

Defendants argue that, should the Court find that genuine issues of material fact do exist, summary judgment must nevertheless be granted in their favor on qualified ·immunity grounds.

 "Qualified or 'good faith' immunity is an affirmative defense that is available to government officials performing discretionary functions." *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1095 (6th Cir.1992). A state official is entitled to qualified immunity if his allegedly unlawful conduct was objectively reasonable when considered in light of the legal rules that were clearly established at the time the challenged conduct was taken and the information possessed by the official. *Id., quoting Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). As stated by the Supreme Court in *Anderson:*

> The contours of the right [alleged to have been violated] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful [citation omitted]; but it is to say that in light of pre-existing law the unlawfulness must be apparent.

483 U.S. at 640, 107 S.Ct. at 3039. The plaintiff bears the ultimate burden of showing that the defendant is not entitled to qualified immunity once the defendant has presented facts to suggest that his actions were in fact performed within the scope of his authority. *Rich,* 955 F.2d at 1095.

 The Court must agree with Defendants that, given the state of the law at the time, their conduct was not objectively unreasonable. Under *Pollock,* inmates may be required to comply—against their religious convictions—with a prison regulation that limits hair length, so long as the regulation reasonably relates to valid penological interests as identified under *Turner.* 845 F.2d at 659; *Campbell,* 957 F.2d at 537; *Iron Eyes v. Henry,* 907 F.2d 810 (8th Cir.1990).

Conceivably, the Court has misbalanced the Plaintiff's and the prison's competing interests under the *Turner* test, and Plaintiff's First Amendment right has been unconstitutionally violated. Even if this is true, howev-

er, the Plaintiff has not demonstrated that Defendants were objectively unreasonable in believing that the *Turner* scale would tip in their favor, as it did for the prison official defendants in *Pollock* under analogous circumstances.

Defendants' have submitted as evidence a December 1987 intra-departmental memorandum approved by the Director of the Department of Rehabilitation and Correction. (Defendants' Exhibit Supplement C, attached to Response). In this memorandum, the Chief Inspector informs managing officers that recent legal decisions support department's decision to apply uniformly the policy requiring all inmates to receive haircuts; managing officers are instructed to grant no new exceptions to this policy.

Even if each defendant did not himself read the memorandum, its directive can be assumed to have colored the understanding of an objectively reasonable person within the institution concerning the lawfulness of Defendants' conduct. Given the tenor of this memorandum and the subsequent *Pollock* decision, it is not possible for the Court to conclude that the unlawfulness of Defendants' conduct was in any way "apparent."

Accordingly, Defendants' are entitled to qualified immunity, and Defendants' motion for summary judgment must be granted for this reason.

### CONCLUSION

For the foregoing reasons, Defendants' second motion to dismiss or for summary judgment (docket # 24) is hereby granted.

IT IS SO ORDERED.